PEARSON, J.
 

 This case, as well on account of the amount involved, as by reason of the many points made upon the trial, has excited much interest, and called for a high degree of ability on the part of the Judge who presided. After a very full discussion at our. bar, and a due consideration of the whole matter, we are glad to be able to come to the conclusion that there is no error, and to feel satisfied that the case was submitted to the jury as fairly, and in a way as well calculated to enable them to decide upon its merits, as could be done, if it was tried over again twenty times.
 

 1. We conclude with his Honor, that the practice in North Carolina has been, and we think it sustained by good sense, for a party to offer as many witnesses as may be deemed necessary to establish his allegation. If the other party chooses, he may rest the case upon it, or he may call witnesses in his turn, and the first party may call witnesses in reply, and for the purpose of adding to the strength of the evidence upon which he at first rested the case. Lord KeNYoN, who had as much good sense as any Judge that ever tried a case, somewhere remarks, “ it is not worth while to jump until you get to the fence,” that is, there is no use in meeting objections until they are presented, or in piling
 
 *164
 
 up proof until it is made .necessary by what is done on the other side. After the propounder had examined some witnesses, as to the fact of -the hand-writing, if he had proposed to call others to the same fact, his Honor .might hav© put a stop to it, and asked, for what purpose are you doing this ? Why, consume the time of the -Court and jury until you hear from the other.side? When the caveators called thirteen- witnesses, who opposed the propounder’s six witnesses, and swore that they did --not believe the script was in the hand-writing of the deceased, it was proper then for him to call his other witnesses as to the hand-writing, and as to the facts and circumstances relevant and bearing on the matters on which the case was to turn, to wit: >Was the paper in the hand-writing of the deceased ? Did he put it among his valuable papers ? And was it found there at his-death ?
 

 In the present case, the counsel for the prqpounder, from, an abundance of caution, consulted his Honor as to the propriety of not calling
 
 nineteen
 
 witnesses to prove the same fact until the other side was heard from. The course adopted, had the express sanction ©f the presiding Judge, and this surely removes .the .ground of ..exception. In the conduct of a trial, much depends upon the ability of the Judge.; It is for him to see that everything is done fairly,, and that neither side is taken by surprise. These matters-must of course be left to his discretion'.
 

 Mr. Graham, in his able-and well -considered argument,, made the suggestion, that counsel .should not be allowed in conduct of a trial, to use all the .strategy of a General in conducting a campaign. That is true, and the distinction is this: Generals have .no Judge to preside over them, and they take whatever course is best calculated to effect the end. Rut. in the conduct of a trial there is a presiding Judge; it is'his duty to see “fair play.” In the .course of the trial -much quickness of perception is called
 
 *165
 
 for: but after the- trial is over, if .he sees that one of the parties has taken the' other at a disadvantage, he may grant a new trial. We are confined to questions of law.
 

 2. The caveators had1 a right to prove, that the deceased always, in writing, contracted the words
 
 “
 
 it is,” so as to make them “its,” but they had no-right to put the letters of the deceased into the hands of the jury, and as it seems to us, his Honor has committed an error in favor of the caveators in allowing the letters to be looked at by the jury, and in telling them- that, as they had a right to look at the letters for one purpose, there was no help for it, they might make a comparison of' the hand-writing. This shows that it was wrong to allow the jury to see the letters at all. A jury is to
 
 hear
 
 the evidence, but not to
 
 see
 
 it. If it depends on eye-sight, it is presumed that a Judge can see as well as the jury: as upon a plea of
 
 nul teil record,
 
 or as the fact of a maim, under the Statute in biting off the ear. Statu v. G-ERKIN, 1 Ircd. 121.
 

 With a few exceptions made by Statute in regard to a jury of view, where water is ponded back by a mill-dam, or a line is disputed, the evidence is to be
 
 heard
 
 by the jury and not to be seen by them'. That this is the principle lying at the foundation of trials by jury, will road-ilybe perceived by reflecting that, in ancient times, a jury would be attainted for a false verdict., This of course depended upon the evidence upon which the jury acted in making up their verdict. In regard to such- incidents as the jury had
 
 heard,
 
 that could be set down and rehearsed before the grand assize ; but in- regard to such evidence as the jury might have seen,
 
 setting it doivn
 
 was out of the question. So, as it seems to us, the presiding Judge was too liberal towards the caveators. Although, it be true, that “-all evidence of handwriting, except the evidence of an eye witness, is by comparison ; yet the rule of law requires that the knowledge in regard to the hand-writing, be acquired before, without re-
 
 *166
 
 fcrence to, and independent of any considerations, that by possibility the pendency of the controversy may have given rise to, one way or the other. At best, an opinion as to the hand-writing of a man must be received by a jury with much caution, and therefore, it is required by law, that such
 
 opinion,
 
 to be fit to be heard, must have been formed under circumstances, when there was no possibility of bias, and with a single eye to the very truth.
 

 3. It is a very grave question, taking all the allegations of the propounder to be true,
 
 is the script testamentary
 
 ?—
 
 a'disposition ?
 
 In plain English, did the deceased mean to dispose of his property, after his 'death,
 
 by
 
 the force and effect of
 
 that very paper ?
 
 We think he did. As it embraces
 
 all
 
 his property of every description, it was clear it was not intended as a gift
 
 inter vivos.
 
 'There is nothing to show that it was intended as .a mere memorandum or direction, by which a lawyer was to draw his will; and .as he most unquestionably intended that it should have some effect, it is manifest that his intention was to make a disposition of his property, to take effect after his death, by the force and effect of that paper.
 

 Mr. Graham, with much force, asked, suppose a man had' picked up
 
 this little paper
 
 in the street, would it have occurred to him that it iras a
 
 will-?
 
 We -are very much inclined to think that some such an idea would have presented itself to his mind; and if he had been informed of the facts; that it was all in the hand-writipg -of the deooascd; that he put it away among his valuable papers, and it was found there at his death, then, beyond -question, any one would say ho intended to make that .paper his will. It is said the paper must speak for itself; -any proof,
 
 aliwnde,
 
 is incompetent. That is true, ivhere the -question is merely 'one of construction : but certainly, when the question is, what is the nature and character of the paper ? — what was it intended for ?— the
 
 res gesta1,
 
 all that ivas done touching and concerning it,
 
 *167
 
 as competent evidence; for these acts impress upon it its «character. COVENTRY v. Williams, 7 Eng. C. L. Rep. 595, This is settled as well here as in England. Clayton v. Liverman, 7 Ired. Rep. 93. Suppose the deceased had requested two witnesses to attest it in his presence, would no.t that fact'be relevant and competent to show what he intended it to be ? Or suppose he had asked some friend to take care of the paper for him, would not that fact have -a strong tendency to show that he considered it a valuable paper.? Would it not be proper to take it into consideration, in order ¡to solve the question what the paper was intended to be ? ’So that, besides the paper itself, we have the facts, as found by thq jury, that the deceased did not treat this as a paper •.such as one would throw into the street,; but he treated it -as a valuable paper — put it carefully away among his bonds, in his little trunk, and it was there found at his death. It is obvious, therefore, that he intended, by the force and effect of this paper, to dispose of his property after his death. He intended it
 
 to be his will.
 

 .4. The object of the law in requiring that the hand-writing of the deceased should be generally known to his acquaintances was, to guard against perjury; and the meaning is, the hand-writing must be so well known that, if a false paper is propounded, the persons interested in the estate would have no difficulty in getting witnesses who'are acquainted with the hand-writing of the deceased, and can expose and defeat any imposition. Without entering into £ minute criticism of the words by which this meaning is attempted to be expressed, it is sufficient for us to say such is evidently the meaning; and when thirty-two witnesses swear that they are acquainted with the hand-writing, that is proof. enough to bring the case within the meaning and intent of the Statute, and there is no error in leaving it to the jury to infer from such evidence that the hand-writing of the deceased was
 
 ugenerally
 
 known by his acquaintances.” This
 
 *168
 
 point has been decided by the Superior Court of Tennessee their Statute is copied from ours, and we are pleased to be able to adopt the very sensible construction put upon it by them, in Tate v. Tate, 2 Humphries 465, whieh fully siis-tains the view taken of it by his Honor in the Court below.
 

 5. We will not attempt to treat' this point in any other view than that taken by his Honor. It is enough1 to say, wo agree with him, as well in his reasoning as in his conclusion.'
 

 6. This is the only point about which the Court has had. much difficulty, and I confess that, but for the very decided opinions of the Chief Justice, and my brother Rattle, .1 should say, his Honor wont too far, (notwithstanding the very groat pains he had taken to impress the jury, that the laboring oar in all the stages of the case was in the hands of the propounder,) in saying to them, “if in the way. you look at the case, it is forced upon you to say, did the propounder
 
 forge
 
 this'paper or not, there is a presumption of innocence in his favor’until the contrary is made to appear.” But deferring to their opinion, and being fully satisfied that the case could never again be submitted to a jury under circumstances as well calculated to make the verdict turn upon the merits, I have brought myself to the conclusion, that, although the words of his Honor, taken by themselves, do import a presumption of innocence, such as should influence a jury in a State case, but which should not bo permitted to have any bearing whatever in a civil proceeding like that now under consideration, yet upon the whole, taking the charge altogether, a jury of twelve intelligent men could not have failed to have been fully impressed with the knowledge, that, according to law, the burthen of proving all his .allegations rested upon the propoundor, and it was for him to prove to the satisfaction of the jury that the paper was in the hand-writing of the deceased, that ho put it among his valuable papers, and that it was found there at his death. So that they could say upon their oaths, that
 
 *169
 
 according to the charge of the Court, and the evidence which had been offered to them, they were' satisfied that the deceased intended
 
 that paper to be Ms.will.
 

 Judgment affirmed and
 
 & procedendo
 
 ordered..