STATE v. HARRY CALDWELL, Alias HARRY CHAPLAN, Alias HENRY WILLIAMS, JESSE FOSTER, FRANK WILLIAMS, GEORGE PEARSALL, JIM HILL.

(Filed 9 March, 1921.)

1. New Trials—Homicide—Criminal Law—Mob Violence—Appeal and Error.

The principle that a new trial will be granted in a criminal action where the conduct of a lawless mob, hostile to the prisoner, had direct bearing on the immediate conduct of the trial, and was of a kind or character intended and well calculated to distract the jury from intelli-

gent, calm, and impartial consideration of the issues involved, has no application when, as under the facts of this case, it is made to appear that the cause was impartially heard and determined in a seeming and well-ordered manner, entirely unaffected by the futile action of the lawless element endeavoring to break into the jail and lynch the several defendants under indictment for murder in the first degree, and giving every assurance that the rights of the defendants, and each of them, were given full consideration.

**2. Trials—Criminal Law—Severance—Court's Discretion.**

In criminal cases, as in this one, a trial of several defendants for the same homicide, it is within the sound discretion of the trial judge to permit or refuse defendants' motion for a severance, and it will not be reviewed in the absence of patent and gross abuse.

**3. Trials—Evidence—Infants—Court's Discretion—Appeal and Error.**

Objection to the admission in evidence of the 11-year-old son of the deceased, on account of his youth and incapacity, etc., upon the trial of homicide, is to the sound legal discretion of the trial judge, which is not reviewable on appeal in the absence of patent or gross abuse.

**4. Appeal and Error—Objections and Exceptions—Unanswered Questions.**

Exceptions to the rejection from the evidence of unanswered questions will not be considered on appeal when the answers thereto are not made to appear.

**5. Jury—Evidence—Jury Room—Documents, Etc.—Trials.**

The jury must determine the cause before them on the evidence as it is heard by them or as presented in open court, unless by consent and in certain restricted instances allowed by statute, and, as a matter of right of a party, the jury is not allowed to take with them documentary or other written evidence for their private inspection.

INDICTMENT for murder of Herman Jones, tried before *Devin, J.,* at November Term, 1920, of WAYNE.

The facts in evidence on the part of the State tended to show: that in the latter part of November, seemingly Sunday the 21st, defendants were in the car of defendant Foster, and between 4 and 5 o'clock p. m. went to the store of deceased, four miles east of Goldsboro, N. C., and were seen standing about the gas tank buying a small amount of gasoline; that this was paid for by defendant Caldwell, handing to Jones a twenty-dollar bill; and that in making the charge Jones displayed a large roll of money, which he took from his pocket; that when this gasoline was bought and paid for, all of defendants were standing around the gas tank and could see the money shown by deceased; that on the same night, between 7 and 8 o'clock, when Jones and his wife and three of their children, a colored boy who helped about the house, and a white boy who was crippled and had to move with crutches, were sitting in a front room of the Jones residence, which was a short distance from

the store, these five defendants in the car drove past the house into the back yard, and came up on the back porch; that defendant Foster came into the room where Jones and the family, etc., were and told deceased that some one out there wished to see him, and Foster then shook hands' with the colored boy and engaged him in conversation; that Jones went out and down the hallway towards the back door, there being at the time a lighted lamp in the hall, and when he had gotten near the back door and about opposite or just beyond the dining-room door, some one of the party, shown to be defendant Caldwell, called to him, "Throw up your hands," and almost immediately fired the pistol, inflicting a mortal wound from which he died in about thirty minutes after he was shot. Mrs. Jones, wife of the deceased, said that all she heard was "Throw up your hands." The colored boy testified the call was, "Throw up your hands or I will kill you!" When the shot fired, Jesse Foster went out and towards the back door, where the party had entered, and they all ran off. The colored boy, the helper, went out that way in the endeavor to see who they were, and the cripple had also fled from the room, prob- ably going out the front door, the theory of the State being that the flight of defendants was caused by the unexpected appearance of the additional members of the household. Only three of the Jones children were present, the eldest of the three, being eight, their oldest child, aged eleven, spending the night with his grandparents.

The course and effect of the bullet tended to confirm the State's evidence that the person who did the shooting was standing in the hall at the time and not very far in the back door.

The defendants were not examined as witnesses in the trial, but with- out objection their statements taken at coroner's inquest were put in evidence and read to the jury, these statements tending to show that defendants had gone to the house for the purpose of getting whiskey, and were in the dining-room, where Jones had brought the whiskey, and while they were in there the defendant Caldwell, who claimed to be a detective, drew his pistol, saying, "You are all under arrest." That all of them threw up their hands except Jones, and he making some move towards his pocket as if for a weapon, Caldwell fired and killed him. No authority or justification for this claim of being an official on the part of Caldwell was shown in evidence.

Under a clear and comprehensive charge from the court presenting every phase of the case, and permissible defenses arising on the testi- mony, the jury rendered a verdict of guilty of murder in the first degree against defendants Caldwell and Foster, and of murder in the second degree against the other three defendants. Judgment in accordance with the verdict, and defendants excepted and appealed.

STATE *v.* CALDWELL.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*E. A. Humphrey and Hood & Hood for Hill and Pearsall.*

*W. S. O'B. Robinson for Foster and Williams.*

*N. D. White for Harry Caldwell.*

HOKE, J. It is chiefly objected to the validity of this conviction that by reason of the action of a lawless mob, and its hostile demonstrations towards them, the defendants were deprived of that fair and impartial trial guaranteed them by the Constitution and laws of the State, but on the record the exception must be overruled. As this is the principal objection insisted on for the defendants, and the occurrence and attendant circumstances at the time and after aroused very great interest and extended comment, we consider it not amiss to incorporate the findings of the trial judge concerning them, which have been duly stated and made a part of the record, in terms as follows:

"The court deeming it proper that a more extended record than is shown upon the minutes of the court should be made of the happenings in relation to the trial of the case of Harry Caldwell and others at the November term of Wayne Superior Court, desires to file the following statement:

"Harry Caldwell and four other prisoners were under indictment for murder in the above entitled case at said court, and were being held for safekeeping in the State's Prison at Raleigh. The sheriff was ordered to bring these prisoners to Goldsboro on the evening of 1 December for trial, which had been set for the following morning. In attempting to carry out this order, and before he could get them to Goldsboro, the sheriff was prevented by a large mob, who sought to lynch the prisoners, and it was only by the courage and skill of the sheriff and his assistants that he succeeded in eluding the mob and returning his prisoners to Raleigh.

"The matter having been brought to the attention of the judge, after consulting with Solicitor W. D. Siler and members of the bar and representative citizens of the county, and being assured that the citizens of Goldsboro and Wayne County would give the court and the officials all the aid in their power to preserve order, and would be willing to render personal service to this end if called upon, the court ordered the prisoners to be at once brought to Goldsboro for trial. Fifty citizens were therefore called upon and sworn in as special officers of the court. This number included every member of the Goldsboro bar, except those engaged in the trial of the case, and many of the most prominent business and professional men of the city.

"These special officers and the sheriff brought the prisoners into court 2 December, and the trial proceeded orderly in the prescribed form and continued until the usual time for adjournment for the evening was reached, when recess was taken until 9 :30 a. m., 3 December.

"During the evening recess of the court, the officers being advised that an effort might be made during the night to take the prisoners from them and lynch them, decided they could be better protected in case of attack in the jury retiring rooms on the third floor of the courthouse than in jail. The jury had been, upon adjournment, sent to rooms up town two blocks away. Those special officers then repaired with their prisoners to the third floor of the courthouse, and being fully armed, so disposed themselves as to effectively cover the only approach to their position. Under the leadership of George C. Freeman (lately Lt. Col., 30th Div., A. E. F.) the special officers were divided into squads and assigned to various duties within and without the courthouse.

"A large crowd surrounded the court square, and much excitement prevailed. This crowd was composed of some lawless elements, but also of many good citizens there from curiosity, and some to help discourage an attack. About 9 :15 p. m., a roughly organized mob of several hundred men, armed and masked, declaring their purpose to lynch the prisoners, made an attack upon the west front of the courthouse, accompanied by a number of pistol and gun shots directed at the building and occupants. The glass in the windows and doors was broken, and the woodwork about the doors on that side injured. The lock of the door was unbroken, however, and those of the special force on that floor refusing to open, the firing from the outside continued until one who appeared to be the leader of the mob was severely wounded by a pistol shot and fell. After this person was carried away, the remainder of the mob retired. There were no casualties among the defenders, and no member of the mob set foot within the courthouse. Thereafter no determined attack was made upon the building, but a large crowd, some angry and threatening, continued to surround the square, and there were occasional firings of pistols during the night.

"The judge, hearing of the attack on the courthouse and its result, and being advised of rumors of other mobs forming and of threats that dynamite might be used, deemed it wise to call upon the Governor for military assistance to relieve the defenders of the prisoners, and in order to be prepared for possible emergencies. The Governor thereupon ordered out a company of riflemen from Burlington and a machine gun company from Durham, under command of Captain Towler. These, however, did not arrive until about 7 a. m., 3 December. At this time the disorder had entirely ceased, but the military companies were useful in relieving

the special officers in charge of the prisoners and in assisting the sheriff in policing the courthouse grounds.

"At 9:30 a. m., 3 December, the jury was brought back to the courthouse, the prisoners brought in, and in the presence of a large, orderly crowd, including many ladies, the trial proceeded regularly to its conclusion. The case was fully argued by counsel for the State and for the prisoners, and the jury, after deliberating for more than three hours, at 9:30 p. m., rendered the verdict which appears on record, two of the prisoners being convicted of murder in the first degree and three of murder in the second degree. The prisoners were sentenced and taken at once to the State's Prison by the sheriff, accompanied by the military companies. The behavior of the officers and of the military companies was exemplary, and their presence reassuring to the people.

"In conclusion, I desire to submit these observations:

"Undeniably the action of the mob constituted an attack upon organized society in the administration of public justice, and was entirely without justification or excuse, and was an attempt to violently interfere with the lawful procedure of the court, but its outcome showed unmistakably that the forces for law and order in Wayne County are stronger than the opposing elements, and that the courts have the power to protect themselves by calling to their aid the influence and active support of good citizens. A forward step has been made by the citizens of Wayne County in controlling the mob spirit which constitutes one of the hindrances to the development of our State.

"The trial of those prisoners would never have been attempted had not the judge felt that he could with confidence rely upon the willingness and the ability of the citizens of Goldsboro and Wayne County to prevent a violation of the integrity of a court, and the trial, once begun, it was determined, with this aid, to carry it to a lawful and orderly conclusion in spite of the efforts of the ignorant and the lawless to the contrary. The event shows this confidence was not misplaced. And while I regret the injury and damage to the courthouse building, and the wounding of a citizen, I believe the outcome one of distinct value to the county and to the State in its demonstration of the power of the forces in favor of law and order when properly called into action. For this was a case of Wayne County citizens, unaided by outside force, and prompted only by a sense of public duty, standing manfully against, and at the imminent risk of their lives, subduing attacks delivered by unruly elements of Wayne County citizenship, and doing so under circumstances calling forth courage, endurance, and determination. The unselfish public service rendered by those who served as special officers deserves praise, and is to each one an honorable distinction. They do not ask

for compensation, but they have an abundant recompense in the approval of their own consciences and in the gratitude of every law-abiding citizen. The court desires to give public and permanent expression to his personal thanks to each one of them.

"I desire to call attention to the names of those who held the third floor of the courthouse during the whole night, and kept the prisoners for the court: George K. Freeman, M. H. Allen, M. T. Dickinson, Lewis and Roy Giddens, John R. Edwards, Kirby Boyette, Doc Dewey, Lawrence Bradsher, Harvey Holmes, Edward R. Michaux, Hugh Dortch, Charles A. Thompson, Jake P. Shrago, George C. Royall, Jr.

"These men chose their position well and strengthened it skillfully. Heavily armed and supplied, they awaited attack with calmness. They were determined to maintain their defense at all hazards, in the performance of a public duty as to which they had no personal interest. They were unconquerable and unafraid. Such spirit should be a source of pride to the citizens of Wayne, and to every North Carolinian. With such spirit as this, our country is safe from attack either from foes without or lawlessness within.

"The following are the names of the sheriff and his assistants who aided the court in these events: William S. Grant, sheriff; deputies, Paul Best, J. C. Rhodes, Walter Grant, Lester Hunt, Thad Howell, and J. H. Howell. The court desires to commend the high courage and faithfulness of Sheriff Grant, and of these assistants, who were not only courageous but wholly devoted to obedience to the orders of the court, and to the suppression of lawlessness.

"The court desires to call attention to and commend the action of many influential citizens, including Judge W. R. Allen, Judge O. H. Allen, Messrs. George Royall, R. H. Edwards, J. D. Langston, and others, who were active in counselling and advising against violence.

"To these forces is due the victory. They have contributed notably to strengthening the confidence of the people in the power of the courts, and to the discouraging of mob violence and lynch law in North Carolina.                    W. A. DEVIN, *Judge*."

From this statement it fully and satisfactorily appears that while the mob, at the commencement and just before the trial, showed a determination to lynch the defendants, yet by the instant and courageous action of the officials and law-abiding citizens of the community this mob was suppressed, and the influence and effect of its conduct entirely removed and effaced, and the trial proceeded with that calmness and deliberation so essential to the administration of well-ordered justice. And in addition to the commendation deservedly expressed by the presiding judge in reference to the conduct of the good citizens of Goldsboro and Wayne

County, we consider it proper that we express like commendation of the upright and able judge who demeaned himself throughout with a firmness, wisdom, and impartiality in every way worthy of the best traditions of his great office.

In the authorities cited and chiefly relied upon by the defendants, *S. v. Wilcox,* 131 N. C., 707; *S. v. Weldon, S. c.,* Annotated Cases, 1913 E, p. 801; *People v. Fleming,* Annotated Cases, 1915 B, p. 881, the conduct objected to necessarily had direct bearing on the immediate conduct of the trial, and was of a kind and character intended and well calculated to distract the jury from an intelligent, calm, and impartial consideration of the issues involved, but not so here, where the cause was heard in a seemly and well-ordered manner, entirely unaffected by the futile action of the lawless element, and giving every assurance that the rights of defendants, and each of them, were given full consideration, a position that finds full support, if any were needed, in the fact that the jury took time in their deliberations and showed discrimination in their verdict, imposing the supreme penalty only on the two·leaders who were most active participants in the offense.

The other exceptions of the defendants are without merit. On the objection that the judge denied defendants' motion for severance, the Court has repeatedly held that the question rests on the sound discretion of the trial judge, and will not be reviewed except in case of patent and gross abuse. *S. v. Southerland,* 178 N. C., 676. And as to the ruling of his Honor in permitting the 11-year-old son of the deceased to be sworn and testify, on account of his youth and incapacity, etc., this, too, is in the discretion of the judge, *S. v. Finger,* 131 N. C., 781, and the answers of the witness on the *voir dire,* and also the directness and intelligence of his testimony, show that in this instance the discretion of the court has been providently exercised.

Another exception was to the refusal of the court to permit the sheriff when examined as a witness to make answer to a series of questions propounded by defendants as to whether deceased had the general reputation of being a whiskey seller. There is doubt on the facts of the record if an affirmative answer to the proposed question would be of sufficient significance to disturb the results of the trial, but the exception is clearly untenable for the reason that it does not appear what answer the witness would have made to the proposed question. The exception, therefore, must be disallowed.

Defendants except further that the judge, on objection, declined to allow the jury to take with them to the jury room the statements of defendants, made before the coroner, and which had been introduced in evidence, but this ruling also is in accord with our decisions on the·sub-

ject, that unless by consent and in certain restricted instances allowed by statute, the jury must determine the cause on the evidence as it is heard by them, or as presented in open court, and is not allowed to take with them documentary or other evidence for their private inspection. *Nicholson v. Lumber Co.,* 156 N. C., 59-68, citing *Williams v. Thomas,* 78 N. C., 47; *Watson v. Davis,* 52 N. C., 178-81; *Outlaw v. Hurdle,* 46 N. C., 150.

On careful examination of the entire record we are of opinion that defendants have had the benefit of a fair and impartial trial, in which their every right has been duly considered and respected, and that no error has been made to appear that gives them any just and legal ground of complaint.

No error.