E. L. MARTIN v. T. B. KNIGHT, admr.

(Filed 6 May, 1908).

**1. Pleadings—Unlisted Solvent Credits—Recovery.**

A defense to an action for the recovery upon certain bonds and due bills, that they had not been listed for taxation, under Revisal, sec. 5219, subdiv. 11, with a view to evade payment of taxes, must be set up in the answer. In the absence of such allegation it was not error in the Judge to refuse to submit an issue relative thereto.

**2. Pleadings—Unlisted Solvent Credits—Defense—Recovery Postponed.**

A failure to list a solvent credit pursuant to section 5219 does not prevent a recovery in an action thereon, but postpones the recovery of *judgment* until it is listed and the taxes are paid.

**3. Evidence—Nonexpert—Paper-writings—Comparisons—Questions for Jury.**

A witness, having testified that he was acquainted with the handwriting of the person alleged to have signed the paper in controversy, may, after expressing an opinion in regard to it and being shown a writing conceded to be genuine, show the two papers to the jury and, by making comparisons between them, explain and point out to the jury the similarity or difference, as the case may be. (*Outlaw v. Hurdle*, 46 N. C., 150, and cases following it, discussed).

**4. Evidence—Solvent Credits—Tax Books and Lists—Incompetent.**

In an action against an administrator upon certain bonds and due bills of his intestate, wherein forgery is alleged, the tax books and original tax lists are incompetent as evidence for the purpose of showing that they were not listed as solvent credits, as they can furnish no information upon which an inference could be drawn in regard to the contention.

ACTION tried before *Ferguson, J.,* and a jury, at May Term, 1907, of STOKES.

Plaintiff sued the original administratrix of W. L. Fallen, deceased, for the recovery of the amount due on a bond and due bill set forth in the complaint. The administratrix having died, Thomas B. Knight was appointed administrator de bonis non and made party defendant. Plaintiff alleged that defendant's intestate, on 16 November, 1896, executed

his bond, under seal, obligating himself to pay plaintiff, six months after date, $2,000, with interest from date; that no part of said bond had been paid save the sum of $40, 13 February, 1897; that on 9 April, 1897, said intestate executed his due bill to plaintiff for the sum of $225 for borrowed money, and that no part thereof had been paid. Plaintiff set forth other indebtedness, which was eliminated by the verdict of the jury. Defendant denied the execution of either bond or due bill, and denied the averment that they had not been paid.

At the proper time defendant tendered the following issue: "Did the plaintiff fail or refuse to list for taxation the $2,000 note described in the complaint with the view to evade the payment of the taxes thereon?" He tendered an issue in the same form in regard to the due bill. His Honor declined to submit the issues, and defendant excepted.

The following issues were submitted to the jury:

"1. Did the defendant's intestate execute the $2,000 note sued on, as alleged?

"2. Has the whole or any part thereof been paid?"

Similar issues were submitted in regard to the due bill. Plaintiff introduced a number of witnesses who testified in regard to the business relations between plaintiff and defendant's intestate. Several witnesses testified that they were acquainted with Fallen's handwriting, and that the signatures to the note and due bill were in his handwriting, and that the "body" of the note was in plaintiff's handwriting. On cross-examination, other papers "purporting to be in Fallen's handwriting" were shown the witnesses, and they were examined in regard to certain letters on the several papers and asked their opinion respecting their similarity, etc. H. T. Pratt, a witness for plaintiff, was shown the note and requested to look at the letter "L" in the signature of W. L. Fallen and the "L" in the name of E. L. Martin on the body of the note and give his opinion whether the two letters were not in the

same handwriting. To this question he answered: "I can see a difference in the two letters." He was then asked to "point out to the jury your points of difference." The defendant's counsel asked the witness to take the exhibit or paper to the jury box and point out to them the difference. To this plaintiff's counsel objected. His Honor sustained the objection. Defendant excepted. The same request was made in regard to other witnesses, and exceptions noted to the ruling of his Honor. The bond and due bill were introduced in evidence.

Defendant introduced a number of witnesses, who testified in regard to the business relations between plaintiff and his intestate, tending to show that defendant's intestate did not execute the note and due bill, nor owe the amount named therein. Among other witnesses introduced by defendant was Dr. J. H. Ellington, who testified that he was acquainted with the handwriting of Fallen. He was shown several papers and expressed the opinion that they were in his handwriting. He was then shown the bond and expressed the opinion that the signature was not in Fallen's handwriting. The following questions were asked Dr. Ellington: "I ask you to look at the letter 'L' in the signature of W. L. Fallen to the bond and say if in your opinion the letter 'L' in the name of E. L. Martin in the body is in the same handwriting." Plaintiff objected. Sustained. Defendant excepted. "Please look at the 'L' in the name of W. L. Fallen at the end of the bond and at the letter 'L' in the name of E. L. Martin in the body of the bond and say in your opinion whether or not they are alike." "Very much alike." The witness was then asked to take the papers and "show the jury why you think they are alike." The plaintiff objected. Sustained. Defendant objected.

The defendant introduced James A. Scales, who testified that he was Register of Deeds of Rockingham County. Plaintiff lives in said county. Witness was custodian of the origi-

nal tax list. The lists from 1896 to 1905 were burned when the courthouse was destroyed. "I have with me the original tax list of E. L. Martin for the year 1906. I have here the tax books of my county for the years 1897, 1898, 1899, 1900. The original abstracts or lists for three years were burned." The, defendant proposed to prove by the introduction of the tax books for the years 1897-1900 that E. L. Martin did not list for taxation a $2,000 note or a $225 due bill. The court declined to admit the tax books, and defendant excepted.

The defendant offered in evidence the original tax abstract for the year 1906 in order to prove that no such note or due bill was listed. This was also excluded upon plaintiff's objection. Defendant excepted. There was no exception to his Honor's instructions to the jury. Verdict for plaintiff. Motion for new trial for errors in refusing to submit issue tendered by defendant and rejecting testimony. Motion denied. Judgment. Appeal by defendant.

*Watson, Buxton & Watson, J. D. Humphreys* and *Lindsay Patterson* for plaintiff.

*Manly & Hendren, C. O. McMichael* and *Scott & Reid* for defendant.

CONNOR, J., after stating the facts: The defendant's exception to his Honor's refusal to submit the issue in regard to the tax list is based upon the contention that, by Revisal, sec. 5219, subdiv. 11, and Acts 1907, ch. 258, sec. 32, a failure to list with a view to evade the payment of taxes on solvent credits prevents their recovery by an action at law or suit in equity in the courts of the State until they are listed and taxes paid thereon. The matter involved in the issue is not set up or pleaded in the answer as a bar to the action, and was not therefore issuable. Only matters alleged and denied or new matter alleged in the answer by way of defense are to be submitted to the jury by specific issues. Without passing upon the question whether the failure to list the note and due

bill for taxation, "with a view to evade the payment of taxes thereon," is an affirmative defense which must be set up in the answer, or whether it may be taken advantage of upon the general denial, we entertain no doubt that, unless pleaded, it may not be made the subject of an issue. As has been frequently said by this Court, issues arise upon the pleadings. It will be observed that the statute does not make the failure to list solvent credits an absolute bar to their recovery, but provides "that they shall not be recoverable  *  *  * until they have been listed and taxes paid thereon." It would seem that the failure to list does not destroy the cause of action, but postpones recovery thereon until they are listed and the tax thereon is paid. It would be but fair to bring the matter to the attention of the court by some appropriate pleading, to the end that the creditor may either list and pay the tax or show that the "note, claim or other evidence of debt" is not "subject to assessment and taxation," as, for instance, that it is not solvent, or that plaintiff was himself indebted in a larger amount than all of his solvent credits [Revisal, secs. 5219 (5), 5227], or that for any other reason he was not required to list and pay tax thereon. It was not the purpose of the Legislature to release the debtor for failure to list by the creditor, but to postpone the recovery of the debt, if subject to taxation, until the tax is paid. It is not clear that the liability to assessment is to be tried by the jury. It may be more convenient for the court to inquire into it. We note the suggestion that, instead of delaying the trial, the court proceed to judgment and order a stay of execution until the debt is listed and the tax paid thereon. This provision has recently been placed in our revenue law and, so far as we are advised, has not before been brought to the attention of the Court. Its interpretation is not before us, and we forbear saying more than is necessary to a decision of the exception. His Honor correctly declined to submit the issue.

Plaintiff introduced H. T. Pratt, who testified that he was

acquainted with the handwriting of Fallen.   He was shown
the note and the due bill, and testified that the signatures were
"those of Fallen."   The body of the note was in the hand-
writing of the plaintiff, E. L. Martin.   This, we understand,
was conceded.   Defendant, upon cross-examination, asked the
witness to look at the letter "L" in the signature and at the
same letter in the body of the note, and say whether they were
not the same handwriting.   He answered: "I can see a dif-
ference in the two."   He was asked to point out to the jury
the difference.   The defendant's counsel asked the witness to
take the note to the jury box and point out to the jury the
difference.   Plaintiff objected.   His Honor sustained the ob-
jection, and defendant excepted.   Dr. Ellington, a witness for
defendant, having testified that he was acquainted with Fal-
len's handwriting, was asked to examine the same letter in
the body of the note and in the signature.   He said: "They
are very much alike."   In his cross-examination he was shown
a paper, "No. 1," by plaintiff, containing W. L. Fallen's sig-
nature in two places.   The witness testified that the first sig-
nature was in Fallen's handwriting; the other was not.   Upon
redirect examination defendant's counsel asked him to take
the paper and show the jury why he did not think that the
signatures were in the same handwriting.   This was objected
to, and the objection sustained by his Honor.   Defendant ex-
cepted.   The question presented upon these exceptions, and
others of the same character in the record, is whether, under
examination in chief or cross-examination, a nonexpert wit-
ness, having testified that he was acquainted with the hand-
writing of the person alleged to have signed the paper in con-
troversy, may, after expressing an opinion in regard to it and
being shown a writing conceded to be genuine, show two
papers to the jury and by making comparisons between them
explain and point out to the jury the similarity or difference,
as the case may be.   Defendant's counsel insist that this ques-
tion has not heretofore been decided by this Court.   Plain-

tiff's counsel insist, on the contrary, that it is within the rule laid down in *Outlaw v. Hurdle,* 46 N. C., 150, and the cases following it. If this is true, defendant's counsel say that the decision in that and other cases is not sound in reason and is out of line with the overwhelming weight of authority. The question is one of much practical importance in the trial of issues involving the genuineness of handwriting, and should, so far as judicial decision can do so, be put at rest in our practice. It must be conceded that the decisions in *Outlaw v. Hurdle, supra,* and *Fuller v. Fox,* 101 N. C., 119, are not in harmony with decided cases in other courts or the law as laid down in the best-approved works on the law of evidence. In an exhaustive note to *University v. Spalding,* 71 N. H., 163 (62 L. R. A., 817), it is said that comparison of handwriting by the jury is allowed in every State save North Carolina and Louisiana, and our own decisions are said to be "unique." Mr. Wigmore, in an exhaustive note citing cases from every court in the Union, regards the question as unsettled in this State. We have given to our decisions a careful examination, with a view of learning how this Court reached and has apparently adhered to a conclusion which, with the single exception named, appears to be at variance with the opinion of every other court in the country. The rules regarding the admissibility of evidence have for their purpose the ascertainment and establishment of truth. The courts have, in response to the demands of a constantly advancing civilization and enlightened jurisprudence, relaxed the rigid rules of evidence which formerly prevailed, and given to the jury all of the light and information possible to aid them in coming to a correct verdict. In no department of jurisprudence has there been more intelligent, enlightened progress than that made pertaining to the law of evidence. This is seen in both judicial decisions and treatises by thoughtful, scholarly authors, frequently resulting in remedial legislation. Prior to the passage of Lord Denman's Act in England, no person inter-

ested in the controversy was permitted to testify, although, most illogically, if during the trial he surrendered his interest or executed a release he became at once a competent and credible witness. This wise and strangely belated statute was not adopted in this State until 1866. It was not until 1879 that a person charged with a crime, although a mere misdemeanor, involving at most a small fine, was permitted to testify, while after the act of 1866 he could be heard as a witness in his own behalf in a suit involving his entire estate. Persons convicted of certain crimes were incompetent, and negroes not permitted to testify against white persons. Juries were permitted and compelled to grope about in the dark, guessing at verdicts, when frequently persons within the call of the court, able and anxious to aid them, were excluded from causes neither sound in reason nor sustained by experience. Gradually, and probably in that respect wisely, the courts and, when they failed, the Legislatures have removed the restrictions and permitted persons to testify without regard to· interest or crime, relying upon that most certain test of truth, cross-examination, and the saving common sense and experience of the jury to weigh the testimony, sift out the false and take the true, to guide them to a verdict. In accordance with this trend of thought, which has done so much to remove reproach from the administration of justice, we think it our duty, when called upon by the arguments of learned counsel, to re-examine any rule of evidence, test its soundness in the light of a larger experience, a broader view and the best thought of Judges in other courts. If, in obedience to precedents since reviewed and reversed, any rule of evidence has been adopted which is found to be unsound and unsuited to reaching the best results, we should, with caution and a full recognition of the principle of *stare decisis,* not hesitate to review the opinions and bring the law into harmony with the best-matured thought upon the subject.

The question in regard to the right of the jury to compare

handwriting in the trial of cases wherein the genuineness of a paper-writing or signature is involved first arose in this Court in 1853.    The case of *Outlaw v. Hurdle*, 46 N. C., 150, was tried before *Judge Manly*, afterwards an Associate Justice of this Court, and the parties were represented by the most eminent counsel in the State.    *Pearson, J.*, in opening his opinion, says: "This case, as well on account of the amount involved as by reason of the many points made upon the trial, has excited much interest and called for a high degree of ability on the part of the Judge who presided."    The verdict was for the propounders, and the *caveators* appealed.    It appears that, among other reasons assigned by the *caveators* for attacking the will, which was holograph, was, it began with the words, "It is my wish and desire," etc., whereas, they alleged, the testator always "contracted the words 'it is' so as to make them 'it's.' "    In this connection the *caveators* introduced a number of letters written by deceased, in which he wrote "it's" for "it is."    These letters, together with others introduced by propounders, were submitted to the jury without objection.    The question of the right to have the jury examine the letters was not presented in any exception, and therefore not argued.    It seems that no question was made in regard to the action of the Judge in this respect.    This is of importance, in view of the manifest care with which the trial was conducted by court and counsel.    *Pearson, J.*, says: "The *caveators* had a right to prove that the deceased always in writing contracted the words,    *    *    *    but they had no right to put the letters of the deceased into the hands of the jury, and, as it seems to us, his Honor has committed an error in favor of the *caveators* in allowing the letters to be looked at by the jury, and in telling them that, as they had a right to look at the letters for one purpose, there was no help for it, they might make a comparison of handwriting.    This shows that it was wrong to allow the jury to see the letters at all.    A jury is to *hear* the evidence and not to *see* it."    The judg-

ment was affirmed. But one authority is cited by the Court—
*State v. Gerkins,* 23 N. C., 121. A reference to that case dis-
closes that it was an indictment for "biting off the ear of the
prosecutor." No question of handwriting or comparison of
anything was presented or suggested. We are not able to per-
ceive how it was in any way related to the question of com-
parison of handwriting or the function of the jury. In view
of the fact that the question had not been raised before 1853,
and of the further fact that no point was made about it in the
trial of *Outlaw v. Hurdle,* wherein every debatable question
was raised and discussed, we think it not improbable that, as
said by the editor of the sixteenth edition of Greenleaf on
Evidence, "The practice of proving handwriting by submit-
ting specimens to the jury was originally orthodox and un-
questioned." The controversy, which has been carried on in
the English and American courts for so many years, and
"which has resulted in such a contrariety of opinion," is not
whether comparison of handwriting may be made by the jury,
but what papers may be used as the basis for comparison, and
the competency of witnesses, experts and nonexperts, to do so.
That question is not involved in this appeal. In *Doe v. New-
ton,* 31 E. C. L., 328, *Denman, C. J.,* said: "There being
two documents in question in the case, one of which is known
to be in the handwriting of the party, the other alleged but
denied to be so, no human power can prevent the jury from
comparing them with a view to the question of genuineness."
All of the Judges wrote opinions. Following *Outlaw v. Hur-
dle* is *Otey v. Hoyt,* 48 N. C., 407. This was an action
on a bond. For the purpose of proving the execution a num-
ber of witnesses were introduced, who testified that they knew
the handwriting of Norcott, the testator of defendant. A
careful examination of the statement of the case shows that
there was no suggestion that any papers be shown the jury or
that they be permitted to compare any handwriting. It is
true that in sustaining the ruling of the court excluding evi-

dence of a witness it is said: "Writings in general are not properly submitted to the inspection of the jury; if used on the trial of a case they may be read to them," citing *Outlaw v. Hurdle, supra.* *Watson v. Davis,* 52 N. C., 178, was an action of *assumpsit* upon an open account. No writing was in evidence and no question of handwriting involved. The Judge permitted the jury to take the account with them, defendant excepting. *Pearson, J.,* said: "The jury ought to make up their verdict upon evidence offered to their senses, *i. e.,* what they see and hear in the presence of the court, and should not be allowed to take papers which have been received as competent evidence into the jury room, so as to make a comparison of handwriting or draw any other inference which their imaginations may suggest." In *Burton v. Wilkes,* 66 N. C., 604, the Judge handed the jury as they retired a memorandum or "slip of paper" containing some calculations. The question of handwriting was not presented. *Boyden, J.,* disposes of the exception by saying: "We think his Honor was in error in delivering Exhibit E to the jury," citing *Outlaw's case* and *Watson's case, supra.* In *Yates v. Yates,* 76 N. C., 142, there was no suggestion of comparison of handwriting by the jury. It was held that a witness who had qualified himself as an expert in regard to handwriting could compare the signature in controversy with one admitted to be genuine and express an opinion based upon such comparison. *Rodman, J.,* said: "This was permissible under the decision in *Outlaw v. Hurdle.* The general practice seems to be more liberal than was approved in that case." The learned Justice cites Greenleaf on Evidence and several cases. In *Williams v. Thomas,* 78 N. C., 47, the point presented was whether the Judge was in error in handing papers used on the trial to the jury, appellant excepting. We find no *decision* other than *Outlaw v. Hurdle, supra,* in which the question involved in this appeal is presented. We have seen in what manner the question arose and the consideration given to it. With all of

the weight to which the opinion of the great Chief Justice is entitled, it cannot be claimed that the question was either presented or decided in the sense in which *authorities* are made, closing the question to consideration otherwise than by overruling the *case.* The course pursued by the Judge was not made the basis of any exception, but was treated as "orthodox and unquestioned." The judgment appealed from was affirmed. Tested by those well-settled rules by which appellate courts are guided in respect to precedents and authorities, it would seem that the question was an open one. We find, however, that it was fully presented and decided in *Fuller v. Fox,* 101 N. C., 119. *Mr. Justice Davis,* after conceding that the law was not uniform, proceeds to say: "But in most of the States, and with rare exception, when there is not statutory regulation upon the subject, the law is held to be as laid down by *Gaston, J.,* in *Pope v. Askew,* 1 Ired. (23 N. C.), 16." When we turn to this case we find that no such question was presented or decided. The action was for writing and publishing a libel. For the purpose of proving that defendant wrote the letter, plaintiff offered to show his handwriting by a witness who was not an expert and who did not qualify himself to express an opinion, having no knowledge of defendant's handwriting. He had received a letter *purporting* to have been written by defendant, but knew nothing more about it. Thereupon plaintiff offered to show by another witness that he had heard defendant say that he wrote the letter received by the witness. D. M. Alexander, a witness for plaintiff, had undertaken to show defendant's signature to some contract. The first witness was then asked to compare the handwriting in the contract, the letter addressed to him and the alleged libelous letter, and give his opinion whether they were written by the same person. Three witnesses for defendant swore that they knew defendant's handwriting, and expressed the opinion that the letter in controversy was not in his handwriting. One of these witnesses also expressed the

opinion that the letter to plaintiff's witness, except the signa-
ture, was not in defendant's handwriting.    The papers were
not given to the jury.    After being out some time they re-
turned and asked for them; the court declined to permit them
to be taken, whereupon some question was raised by the jury
in regard to the testimony of a witness about certain letters in
the contract, and the letter to one of the witnesses.    The court
permitted the jury, in its presence and "for this special pur-
pose," to compare the particular letters referred to.    The de-
cision is based upon the failure of plaintiff's witness to qualify
himself to express an opinion, and the further fact that neither
of the papers used as a basis of comparison was admitted to
be genuine.    No reference is made to the action of the jury,
the opinion concluding with the statement: "We see no legiti-
mate reason for which either of the instruments was received
in evidence.    It is worthy of note that *Judge Pearson,* in *Out-
law v. Hurdle,* does not· cite the case as authority, but does
cite *Gerkins' case,* decided at the same term.    *Judge Gaston's*
opinion is based upon *Doe v. Suckermore,* 5 Adol. & Ellis, 31
E. C. L., 406, which makes no reference to the question under
discussion.    *Pope v. Askew* was cited by *Nash, C. J.,* in
*McKonkey v. Gaylord,* 46 N. C., 94, upon the qualification
of a witness to express an opinion in regard to handwriting.
This was at the same term at which *Outlaw v. Hurdle* was
decided, thus, we think, indicating that the Court did not
regard *Judge Gaston's* opinion as having any relation to the
question under discussion in that case.    *Pope v. Askew* has
been frequently cited upon the question of opinion evidence
in regard to handwriting.    Munroe's Cited Cases.    The
learned Justice also cites *Rowell v. Fuller,* 59 Vermont, 688,
and says "that in most of the cases relied on by counsel for
defendant the papers permitted to go to the jury for inspec-
tion and comparison were such as were in evidence in the
cause for other purposes, or such as were first passed upon by
the court and adjudged to be genuine."    A careful reading

of the able opinion of *Taft, J.,* in that case, sustains the language of *Judge Davis* in regard to the standard of comparison, but expressly holds that when such papers are offered as a standard for comparison they should be submitted to the jury for inspection.   He says: "Let the court determine whether the signature is a genuine one or not.   If not genuine, exclude it from the jury; if genuine, let it be used by them in comparison with the disputed one."   The only question discussed was whether the court should pass upon the genuineness of the writing as a standard for comparison.   That, when found to be so, it should be submitted "as a standard of comparison with the one in dispute," is said to be the rule.   We have called attention to the language of the learned Justice in *Fuller v. Fox* and the cases cited by him to show that, as in other cases, the court has inadvertently confused the question of standard of comparison, the competency of the witness to express an opinion, with the right of the jury, after these preliminary questions are passed upon, to see the paper for the purpose of comparison.   This tendency is noted by Professor Wigmore in his note to section 578, Greenleaf Evidence (16th Ed.), wherein he says: "So far as proof by similarity was allowed at all, no discrimination was made against submitting specimens to the jury."   Defendant's counsel proposed to have the witnesses who had testified that they knew Fallen's handwriting and expressed their opinion in regard to the genuineness of the signature, and who also expressed opinions in regard to the similarity of the letter "L" in the body of the note and the signature, to show the note to the jury and point out to them the difference or similarity.   It is difficult to see why they should not be permitted to do so, unless the *decisions* in *Outlaw v. Hurdle* and *Fuller v. Fox* prohibit it.   It is clear that no other decision does so.   We think that in the light of those decisions the witnesses could show to the jury the paper upon which the note and the disputed signature are written, and explain to them their reasons for saying that

147—37

there was or was not a difference between the letter "L" in the body of the note and in the signature. For the purpose of explaining their testimony and the situation of persons or objects it is well settled that maps, diagrams, drawings or photographs may be used. *State v. Whiteacre,* 98 N. C., 753; *State v. Willcox,* 132 N. C., 1120; Greenleaf Ev., 419. On a question of paternity the child may be shown to the jury, and they may, for the purpose of making comparison in respect to resemblance, see the parents and child. *State v. Woodruff,* 67 N. C., 89. In *Hampton v. Railroad,* 120 N. C., 534, a photograph was rejected, but in *Davis v. Railroad,* 134 N. C., 300, we followed the dissenting opinion of the present Chief Justice, sustained by the overwhelming weight of authority, so the jury may, if the Judge think they will better understand the matter in controversy, view the premises. To restrict the witness to an explanation and description of loops, curves, lines, shades, etc., etc., found in two letters which he is comparing, concealing from the jury the very object about which he is talking, seems to us both unreasonable and unsafe as a means of enlightening them. The purpose of the evidence is to aid the jury. Why convey information through the sense of hearing and exclude the sense of seeing? Can it be doubted for a moment that they would receive a clearer, more intelligent view of the matter in controversy if permitted to have the explanation made with the aid of their sight? . We know from experience that arguments in this Court are illuminated and our apprehension of the matter in controversy made clearer by maps in cases involving questions of boundary, or models and photographs in cases involving the management of machinery or the situation of parties. It was supposed in the past that the average juror was not sufficiently intelligent—educated—to comprehend the fine shades of difference in handwriting. Whatever may be thought of the soundness of the reason in the past, it is manifest that it has but little force at this time. As education and

intelligence have increased and the methods of illustration improved, the capacity of the "average man" to write and pass upon the handwriting of others has advanced. It may be that language used by this Court in several of the cases cited and discussed by us is capable of a construction which would prohibit the course of examination proposed by the defendant. If so, we think such language was not accurate or not necessary to the decision of the question involved in such cases—that the jury could not take the papers into the jury room for the purpose of comparison. It is true that the Court said, in *Outlaw v. Hurdle,* that jurors must *hear* and not *see* evidence. The expression is rather more epigrammatic than accurate. This is shown by the language of the same Judge in *Watson v. Davis,* in which he says: "The jury ought to make up their verdict upon the evidence of their senses, *i. e.,* what they *see* and *hear* in the presence of the court." The real point *decided* in these and other cases is that the jury may not take the papers with them into the jury room for the purpose of making the comparison. It is not necessary that in this appeal we bring the correctness of the decision in that respect into question. We simply decide the question presented by the exception—that the witnesses should have been permitted to take the note to the jury and show to them the genuine and disputed parts, explaining to them their reasons for saying that they were or were not different. It may be that the reason of the thing would carry us further. That question is not necessary and would not be proper to discuss here. In England the subject is regulated by statute. 28 and 29 Vict., ch. 18. In many of our States statutes have been enacted prescribing the practice.

The English statute is the result of the largest experience and observation by judges and lawyers. It is well guarded against dangerous experiment, but opens the door to safe, reliable information. A discussion of its provisions may be found in 3 Taylor on Ev., sec. 1869, etc. In construing the

New York statute, *Van Brunt, P. J.,* says: "Therefore, it is apparent that the submission of a writing to a jury must be in connection with the testimony of witnesses in regard to the validity or authorship of the various handwritings, and that, independent of the examination of witnesses, such handwritings cannot be submitted to the jury for the purpose of arbitrary comparison by them. In other words, the handwritings can only be inspected by the jury in aid of the testimony of witnesses in reference to the authorship of the handwritings in question." *People v. Pinckney,* 67 Hun., 428. With this limitation upon the right of the jury to examine and compare handwriting, we can see no reasonable ground for withholding it. The subject is of sufficient importance to justify the attention of the Legislature. The questions regarding the competency of witnesses to testify in regard to handwriting, and the standard of comparison, are settled by a number of well-considered decisions, the last being *Tunstall v. Cobb,* 109 N. C., 316. While there was a dissenting opinion in regard to the application of the law in that case, the Court was unanimous as to the general rule. The opinion of *Mr. Justice Avery* in that respect adopts the generally received doctrine in this and many other States. It has been followed in this State. *Lowe v. Dorsett,* 125 N. C., 301; *Ratcliff v. Ratcliff,* 131 N. C., 425. We do not question the decisions cited and commented upon, in which the Judge permitted the jury to take into the jury room papers, etc., used on the trial. We have cited them for the purpose of distinguishing them from the facts in this appeal. The defendant's exceptions to the refusal of his Honor to permit the witness to show the jury the papers and point out to them points of difference or similarity in regard to which they have expressed opinions are sustained.

Defendant proposed to introduce tax books and original lists for the purpose of showing that no note or due bill was listed by plaintiff for taxation. While the record does not

so state, we assume from the argument that it was proposed
to show that no solvent credits were listed by plaintiff for the
years to which the proposed list related.   Tax lists have been
admitted in actions for the recovery of land to show that the
party against whose claim they were used did not list the land,
and draw from the failure to do so the inference that he was
not claiming to own it.   *Thornburg v. Mastin,* 93 N. C., 259;
*Austin v. King,* 97 N. C., 339; *Allen v. McLendon,* 113 N. C.,
319; *Bernhardt v. Brown,* 122 N. C., 587.   On a question of
insolvency, *Shober v. Wheeler,* 113 N. C., 370; to show the
value of personal property, *Daniels v. Fowler,* 123 N. C., 35.
In these cases the law required that the property, number of
acres, name of tract, etc., be stated on the list; that the per-
sonal property be valued by the taxpayer.   While the Court
has always referred to this class of evidence as of a "low
order," it has admitted it as declarations of the party.   In
regard to solvent credits a different rule prevails.   The sol-
vent credits of the citizen which are "subject to assessment
and taxation" are the notes and other evidence of debts owing
to him, less the amount of *bona fide* collectible debts which he
owes as principal debtor.   These are to be deducted from the
credits, and only the amount in excess listed.   The name of
the debtor or the amount of any specific debt is not to be listed.
Revisal, secs. 5217-5219.   The blank sent to the commis-
sioners by the State Auditor (section 5216), which the tax-
payer is to fill up, sign and swear to, does not provide for any
schedule of credits; no space or column is provided therefor;
hence the lists would furnish no information and constitute no
ground for drawing an inference in regard to the solvent
credits of the plaintiff.   They would not prove any fact
throwing light upon the issue.   If the plaintiff owed debts in
excess of the amount due him he would list no solvent credits.
It is clear that a paper-writing or record containing no in-
formation upon which an inference could be drawn in regard
to the matter in controversy is irrelevant and inadmissible for

any purpose. The exceptions to his Honor's refusal to permit the introduction of the tax lists must be disallowed. We have examined the entire record and find no merit in the other exceptions. For the error pointed out in regard to proof of the disputed handwriting there must be a

New Trial.