STATE OF NORTH CAROLINA v. MARVIN AUGUSTA OWEN

No. COA97-1135

(Filed 18 August 1998)

**1. Evidence— handwriting authentication—comparison by jury to known sample**

The trial court did not err in a first-degree murder prosecution by admitting a handwritten note from defendant to the victim in which he said he would never push or hit or hurt her again where the State had no witness to authenticate the handwriting and proposed that it be authenticated by comparing it with a rights form which bore defendant's signature and which had been previously authenticated and admitted, the trial court compared the signatures, and concluded that there was sufficient similarity to enable the jury to determine whether defendant was the person who had signed the note. In determining the authenticity of a document, a jury may compare a known sample of a person's handwriting with the handwriting on a contested document without the aid of either expert or lay testimony; however, the trial court must first satisfy itself that there is enough similarity that the jury could reasonably infer that the disputed handwriting is genuine. The trial court in this case conducted the appropriate review for determining the authenticity of the disputed note.

**2. Evidence— prejudicial impact—note from defendant to victim**

The trial court did not err in a first-degree murder prosecution by admitting a note from defendant to the victim in which he said that he would not hurt her again. Although defendant argued that the prejudicial impact outweighed the probative value, the note tended to shed light on both defendant's state of mind and the nature of his relationship with the victim. Furthermore, the tone of the note was one of compassion and amelioration, conveying only that defendant had in the past been violent and not that he would be so in the present or the future.

**3. Homicide— lesser-included offense of second-degree murder—instruction not given**

There was no plain error in a first-degree murder prosecution where the trial court did not instruct the jury on a lesser-included offense of second-degree murder where the only evidence pre-

sented of a "heat of passion" defense was that eight or more hours prior to the murder, defendant and the victim had an argument over defendant's desire to claim their child as a tax deduction; not a scintilla of evidence was presented that defendant was enraged or overcome by violent passion as a result of this argument or that his anger and emotions were so strong that they disturbed his ability to reason eight or more hours later. Indeed, the lack of such evidence, in conjunction with the fact that the victim was shot eight times (twice from close range) with a handgun which had to be reloaded provided unmitigated evidence of premeditation and deliberation.

**4. Appeal and Error— offer of proof—reviewable on appeal— informal**

The trial court's rulings in a first-degree murder prosecution on the cross-examination of an SBI agent were reviewable on appeal even though no formal offer of proof was made by defense counsel regarding the answers he expected from excluded questions, because the content of the agent's testimony was nonetheless revealed during voir dire examination.

**5. Evidence— veracity—defendant—SBI agent's opinion— excluded**

The trial court in a first-degree murder prosecution properly sustained the State's objections to questions defendant posed to an SBI agent regarding his belief in defendant's post-arrest story. A lay witness may testify in the form of an opinion even though that opinion may embrace an ultimate issue decided by the jury, but there is no indication from the evidence that the expected answers here would have enabled the jury to better understand the agent's testimony or that they would in some way have aided the jury in its determination of a specific fact in issue. N.C.G.S. § 8C-1, Rule 701.

**6. Evidence— chain of custody—weak link—weight rather than admissibility**

The trial court did not err in a first-degree murder prosecution by admitting bullets removed from the victim's body and unspent cartridges from a gun where the lab examiner failed to identify the specific individual at the FBI lab who handled the evidence prior to the exhibits being transferred to her for evaluation. The agent testified that the exhibits came to her in a sealed package, were kept in a sealed room at the lab, that it was normal

STATE v. OWEN

[130 N.C. App. 505 (1998)]

procedure for evidence from a state bureau of investigation to exchange hands several times before it reached her particular unit at the FBI lab, that it was normal procedure for the evidence to be brought to the FBI control unit and then given to a particular lab unit where it would be transferred to a particular unit examiner, and that there was nothing about the package she received in this case which gave her cause to believe that the evidence had been tampered with or altered. Any weak links in the chain of evidence go to the weight of the evidence, not to its admissibility.

Appeal by defendant from judgment entered 25 March 1997 by Judge Henry W. Hight, Jr. in Granville County Superior Court. Heard in the Court of Appeals 21 May 1998.

*Michael F. Easley, Attorney General, by Ronald M. Marquette, Special Deputy Attorney General, for the State.*

*Majorie S. Canaday, for defendant.*

WYNN, Judge.

Having been convicted by a jury of the first-degree murder of Gloria Puryear, Marvin Augusta Owen seeks a new trial, contending that the trial court committed prejudicial error by: (1) admitting as evidence State's exhibit #34, a handwritten note he allegedly wrote to Ms. Puryear before her death; (2) failing to instruct the jury on the lesser included offense of second-degree murder; (3) sustaining the State's objections to certain cross-examination questions his counsel asked of SBI agent Greg Tart; and (4) admitting into evidence seven bullets removed from Ms. Puryear's body upon her death as well as the cartridge from the gun which was allegedly used to kill her. Because we find no prejudicial error in any of the trial court's rulings, we hold that Owen received a fair trial, free from prejudicial error.

At trial, the evidence for the State tended to show that on 16 January 1996, the body of Gloria Puryear, having been shot eight times—twice from close range—was found in a ditch near a road in Granville County, North Carolina. Ms. Puryear, the mother of Owen's child, often commuted with him from Virginia to her night-shift job in Roxboro, North Carolina. On the day of her murder, Ms. Puryear's co-workers testified that prior to Ms. Puryear getting off work that morning, she told them that she had driven to work with Owen in his father's car and that during the ride, she and Owen got into an argu-

ment because he wanted, over her objection, to claim their child as a tax deduction. Also, a nearby resident testified that shortly before Ms. Puryear's body was discovered, she had observed an unusual burgundy car in the area where the body was found. The car, which was later identified as the car of Owen's father, contained clothing fibers consistent with those Ms. Puryear wore the day she died.

When first questioned by the State Bureau of Investigation, Owen stated that he had not taken Ms. Puryear to work the night of her murder and that he was worried about her because he had not seen her all day. However, later on in the investigation, he admitted to the agents that he picked Ms. Puryear up from work that day in his father's car. He also told investigators that he had driven Ms. Puryear to a drug deal, during which time, he claimed, she was shot dead by three unknown assailants with the .32 caliber pistol that she kept under the seat of the car. Owen told the investigators that after the two men shot her, they put her body into the back of his father's car, drove to some nearby water and eventually dumped the body.

Upon the conclusion of the State's case, Owen, having opted to present no independent evidence and the jury not believing the story he told investigators, was found guilty of first-degree murder in violation of N.C. Gen. Stat. § 14-17. Thereafter, the trial court sentenced Owen to life imprisonment without parole, there being insufficient evidence of aggravating factors to certify the case as capital. This appeal followed.

Other facts pertinent to the issues raised by Owen in this appeal will be discussed more fully in the body of this opinion.

## I.

[1] Owen first argues that the trial court erred in admitting, over his objection, a handwritten note that the State alleged he wrote to the victim. Specifically, Owen argues that the note, which was offered by the State as exhibit #34, was not properly authenticated by the State and that the trial court erred in admitting it by way of comparison with another exhibit already admitted into evidence. We disagree.

The subject note was found by Ms. Puryear's mother among her daughter's possessions and reads as follows:

Dear Glo,

> This is a letter telling you that I love you. I, Marvin Owen, will never push or hit or hurt you again and if I do you turn this letter

STATE v. OWEN

[130 N.C. App. 505 (1998)]

over to my parents, or worse turn it in as a written statement admitting that I hit you to the cops or Social Service as a way of keeping me from you and little boogy. If I, Marvin Owen, ever hit Gloria Puryear again this letter can be used against me.

According to the State, the evidence showed that this printed note was authored by Owen because it bore the cursive written signature of "Marvin Owen." At trial, however, Ms. Puryear's mother testified that she had no familiarity with Owen's handwriting and that she did not know when the document was written or under what circumstances it had been written. Consequently, the State, having no witness to authenticate the handwriting as being that of Owen's, proposed that the note be authenticated by comparing it with State's exhibit #7, an advertisement of rights form which bore the signature of Owen and had been previously authenticated and admitted into evidence. Responding to this proposal, the trial court compared the signature on State's Exhibit #7 with that found on the note and concluded that there was sufficient similarity between the two signatures so as to enable the jury to determine whether Owen was indeed the person who signed "Marvin Owen" to the note.

Owen contends on appeal that the trial court erred in making such a finding because absent expert testimony that the printed body of the disputed noted was written by the same person who signed exhibit #7, "the mere comparison of the signature on State's exhibit #7 with that on exhibit #34 [was] not sufficient to support a finding that exhibit #34 is a genuine document created by the defendant." This argument is without merit.

In determining the authenticity of a document, it is a well-settled evidentiary principle that a jury may compare a known sample of a person's handwriting with the handwriting on a contested document without the aid of either expert or lay testimony. N.C. Gen. Stat. § 8C-1, Rule 901(b)(3); *State v. LeDuc*, 306 N.C. 62, 291 S.E.2d 607 (1982), *overruled in part on other grounds by State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987). However, before handwritings may be submitted to a jury for its comparison, the trial court must satisfy itself "that there is enough similarity between the genuine handwriting and the disputed handwriting, such that the jury could reasonably infer that the disputed handwriting is also genuine." *LeDuc*, 306 N.C. at 74, 291 S.E.2d at 614.

In this case, the trial court determined that the signature on exhibit #7 was properly authenticated. Therefore, having established

STATE v. OWEN

[130 N.C. App. 505 (1998)]

a known sample of Owen's signature, the trial court did not need the aid of expert testimony to determine if the known signature was sufficiently similar to the one on the note. Moreover, contrary to what Owen seems to assert, we can surmise no reason why the trial court, in comparing the two signatures, would need to compare the printed body of the disputed note with the cursive signature on exhibit #7. If the jury determined that Owen signed the note after comparing the signature on it to the already authenticated one on exhibit #7, then it could have properly attributed the contents of the note to Owen as well, even if, for example, he had not actually written the printed portion of the note. *See* N.C.R.Evid. Rule 801(d)(B). For these reasons, we conclude that the trial court conducted the appropriate review for determining the authenticity of the disputed note.

Finally, having ourselves examined the signatures on both exhibit #7 and the disputed note, we too are satisfied that there is enough similarity between the two signatures for the State to have properly authenticated the disputed note and for the trial court to have then submitted that note to the jury for its comparison with exhibit #7. *LeDuc*, 306 N.C. at 74, 362 S.E.2d at 614 (stating that the trial court's determination as to whether a disputed document is sufficiently similar to a genuine document is a question of law, fully reviewable on appeal). Accordingly, we find no error in the trial court's decision to admit into evidence the note that Owen allegedly wrote to Ms. Puryear.

[2] Notwithstanding the above conclusion, Owen contends that under evidentiary Rule 403, the note still should not have been admitted into evidence because its prejudicial impact on his case substantially outweighed its probative value. The note's admittance was highly prejudicial, Owen argues, because it communicated to the jury that he had been violent in the past with Ms. Puryear and that therefore, he must have been guilty of the crime charged. This argument is also without merit.

While the note allegedly written by Owen tended to show that he had a history of being violent with Ms. Puryear, generally, ill will between a defendant and a crime victim is relevant to show possible motive for the crime. *See State v. Greene*, 324 N.C. 1, 15-16, 376 S.E.2d 430, 439 (1989), *death sentence vacated*, 494 U.S. 1022, 108 L.Ed.2d 603 (1990), *on remand*, 329 N.C. 771, 408 S.E.2d 185 (1991). The note in this case tended to shed light on both Owen's state of mind and the nature of his relationship with Ms. Puryear. Furthermore, because the

tone of the note was one of compassion and amelioration, conveying only that Owen had in the past been violent with the Ms. Puryear, and not that he would be so in the present or the future, we believe that if Owen's case was indeed prejudiced by the note's admission, such prejudice was not so great as to have substantially outweighed the note's probative value.

We, therefore, hold that the trial court in this case did not err when it admitted into evidence State's exhibit #34 as it had been properly authenticated by way of comparison with State's exhibit #7 and it was not unfairly prejudicial to Owen's case.

## II.

[3] Next, Owen argues that the trial court erred in "failing to instruct the jury on the lesser included offense of second-degree murder when the instruction was supported by the evidence and proper in law." We disagree.

At the outset, we note that the record in this case indicates that Owen did not request a charge on second-degree murder; therefore, we must evaluate the trial court's failure to give such an instruction under the "plain error" standard. *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). Under this standard, a trial court is said to have committed "plain error" if its failure to give an instruction was so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached. *State v. Walker*, 316 N.C. 33, 39-40, 340 S.E.2d 80, 83-84 (1986) (quoting *State v. Black*, 308 N.C. 736, 740-41, 303 S.E.2d 804, 806-07 (1983)). In that regard, Owen argues that the trial court's failure to instruct the jury on second-degree murder was plain error "since it likely 'tilted the scales' against [him] and resulted in a verdict different from the one which it might have otherwise reached." He contends that "[t]he evidence tended to show that if [he] committed the crime charged at all, it was as a result of overwhelming anger from a domestic argument rather than a conscious and deliberate plan."

The distinction between first-degree and second-degree murder is rather clear in our criminal law. First-degree murder is the unlawful killing of a human being with malice, premeditation, and deliberation, while murder in the second-degree is considered the unlawful killing of a human being with malice, but without premeditation and deliberation. N.C. Gen. Stat. § 14-17; *State v. Gainey*, 343 N.C. 79, 468

S.E.2d 227 (1996). "A killing is 'premeditated' if the defendant formed the specific intent to kill some period of time, however short, before the actual killing." *State v. Geddie*, 345 N.C. 73, 94, 478 S.E.2d 146, 156 (1996) (quoting *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991)). A defendant is said to have "deliberated" over a killing if he acted "in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and [he was] not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* The fact that a defendant was angry or emotional, however, does not negate a finding of deliberation unless his anger or emotion was strong enough to have disturbed his ability to reason. *Id.* (citing *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 338 (1986)).

Applying the foregoing principles to the facts of this case, we find no error in the trial court's refusal to instruct the jury on the offense of second-degree murder. The only evidence presented at trial of a "heat of passion" defense was that some eight or more hours prior to the alleged murder, Owen and Ms. Puryear had an argument over his desire to claim their child as a tax deduction. Not a scintilla of evidence was presented that Owen was enraged or overcome by a violent passion as a result of this argument, or more importantly, that if he was enraged that his anger and emotions were so strong that they disturbed his ability to reason some eight or more hours later. Indeed, the lack of such "heat of passion" evidence, in conjunction with the fact that Ms. Puryear was shot eight times—twice from close range—with a handgun that the evidence showed had to be reloaded in order for it to have been fired more than six times provides convincingly, in our view, unmitigated evidence of premeditation and deliberation. *See State v. Watson*, 338 N.C. 168, 179, 449 S.E.2d 694, 701 (1994), *cert. denied*, 115 S.Ct. 1708, 131 L.Ed.2d 569 (1995) (holding that the number of wounds on a victim is evidence of premeditation and deliberation under the "felled victim theory"). Accordingly, we hold that the trial court was correct in only instructing the jury on the offense of first-degree murder.

## III.

[4] Owen's third argument on appeal concerns the testimony of State Bureau of Investigation Agent Greg Tart who testified that Owen told him, upon his being arrested, that he had driven Ms. Puryear to Granville County to consummate a drug deal with three men who in the end, killed her with the gun she had hidden under his father's car

seat. Specifically, Owen contends that the trial court erred in sustaining the State's objections to certain cross-examination questions his counsel asked of Agent Tart regarding his belief of this post-arrest story. Again, we disagree.

The questions Owen contends his counsel should have been allowed to ask Agent Tart occurred during the following interchange on cross-examination:

Q: And you of your own knowledge don't know whether he did or whether he didn't do you?

THE STATE: I object to that, your Honor, it goes to the ultimate question which is for the jury to decide.

THE COURT: Sustained, sustained.

Q: Well, I asked him of his own knowledge?

THE STATE: Object.

THE COURT: Sustained.

. . .

Q: And that's when you say that he told you this story about the—about the drug deal and all that?

A: Yes.

Q: Is that right?

A: Yes.

Q: And you don't believe that to be true, do you?

THE STATE: Objection.

THE COURT: Sustained.

Q: Well, you don't know whether or not its true, do you?

THE STATE: Objection.

THE COURT: Sustained.

. . .

Q: And again, he told you that he didn't shoot Gloria Puryear?

A: Yes.

Q: He also told you he was scared, didn't he?

A: I asked him why he lied to me and he told me he was scared, yes.

Q: And you don't know whether or not he lied or not, do you?

THE STATE: Objection to that, you Honor, it calls for an opinion for the jury to determine.

THE COURT: Sustained.

Responding to Owen's challenge of the above rulings, the State contends, preliminarily, that any error the trial court may have committed is unreviewable because the record does not indicate what Agent Tart's testimony would have been had he been permitted to respond to defense counsel's questions. N.C.R.Evid. 103(a); *State v. Najewicz*, 112 N.C. App. 280, 292, 436 S.E.2d 132, 140 (1993), *disc. rev. denied*, 335 N.C. 563, 441 S.E.2d 130 (1994) (holding that a defendant's failure to demonstrate the content of the evidence he contends was erroneously excluded, precludes appellate review of the contested issue). We disagree.

Although no formal offer of proof was made by defense counsel regarding the answers he expected to receive from Agent Tart, the content of the agent's testimony was nonetheless revealed during his voir dire examination. For example, Agent Tart testified on voir dire as follows:

Q: So the only reason you had this conversation with him right here is to try to get him to confess to you, isn't that true? A: Trying to get him to tell me the truth, yes.

Q: And he never did, did he?

A: Tell me the truth?

Q: Confess to you.

A: He never told me the truth, no, or confess.

Q: Well, Agent Tart, you don't know what the truth is, do you, because you weren't there when this lady was killed?

A: I believe I know what the truth is.

Q: But you weren't there, were you?

A: No, I was not.

Q: So you don't know what the truth is, do you?

A: In that terms, [sic] no, I did not.

Given this testimony, we conclude that the trial court's rulings on cross-examination of Agent Tart is indeed reviewable by us in this appeal. *See State v. Satterfield*, 300 N.C. 621, 628, 269 S.E.2d 510, 515-16 (1980) (when evidence is excluded, "the record must sufficiently show what the purport of the evidence would have been," otherwise the propriety of the exclusion will not be reviewed on appeal). Thus, we now turn to the question of whether the trial court properly excluded the testimony defense counsel sought to elicit from Agent Tart.

[5] In addressing this issue, we note first that under Rule 704 of our Rules of Evidence, a lay witness may testify in the form of an opinion, despite the fact that his opinion may embrace an ultimate issue to be decided by the jury. N.C.R.Evid. Rule 704. Therefore, the State's objection to the questions posed by defense counsel on the ground that the questions went to an ultimate issue to be decided by the jury was not a proper basis for excluding the expected testimony of Agent Tart.

However, although proper under Rule 704, we must nonetheless find that the trial court in this case committed no error in sustaining the State's objections to defense counsel's questions as the opinion those questions called for would not have been proper under Rule 701 of our Rules of Evidence, which provides that:

> [i]f a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

In this case, the answers defense counsel sought to elicit from Agent Tart may have been rationally based on his perception of defendant during his post-arrest meeting with him; however, there is no indication from the evidence that the expected answers would have enabled the jury to better understand Agent Tart's testimony, or that they would have in some way aided the jury in their determination of a specific fact in issue. Thus, whether Agent Tart believed the story Owen told him of the busted drug deal between Ms. Puryear and the two male drug dealers, or whether he believed that Owen was in fact the individual who committed the murder is irrelevant where, as

here, there was nothing about Agent Tart's testimony which his opinion as to the veracity of Owen's story could have further explained or illuminated. We, therefore hold that the trial court properly sustained the State's objections to the questions defense counsel posed of Agent Tart regarding his belief of Owen's post-arrest story.

## IV.

[6] Finally, Owen challenges the admittance of certain of the State's exhibits on the ground that they were not properly authenticated. He contends that the trial court erred in admitting into evidence State's exhibits #21 through #27, which were seven of the eight bullets removed from the victim's body, and exhibit #33, three unspent cartridges from the gun used to kill the victim, because, he argues, FBI Agent Kathleen Lundy, the lab examiner who analyzed the exhibits, failed to identify the specific individual at the FBI lab who handled the bullets and cartridge prior to the exhibits being transferred to her for evaluation. This failure, Owen argues, amounted to a "missing link" in the chain of custody needed to establish the authenticity of the exhibits. We disagree.

Before real evidence, such as projectiles and bullets, can be properly admitted into evidence, a trial court must first determine whether the items offered were the same objects involved in the incident and that those items underwent no material change. *State v. Taylor*, 332 N.C. 372, 388, 420 S.E.2d 414, 423-24 (1992) (quoting *State v. Campbell*, 311 N.C. 386, 388-89, 317 S.E.2d 391, 392 (1984)) (citations omitted). In making such a determination, however, the trial court need not make a finding as to whether a detailed chain of custody was established unless the items offered were not readily identifiable or were susceptible to alteration and there was some reason to believe that they had been altered. *Id.* Furthermore, in judging the sufficiency of any chain of custody evidence, any weak links in the chain is to go to the weight of the evidence, not to its admissibility. *Id.*

Bearing the foregoing in mind, we conclude that the trial court in this case did not err in admitting into evidence State's exhibits #21 through #27 and #33. While Agent Lundy was not able to specifically identify who possessed the bullets and the cartridges before they were transferred to her for evaluation, she did testify that the exhibits came to her in a sealed package, that they were kept in a sealed room at the lab, and that it was "normal procedure" for evidence from a state bureau of investigation to exchange hands several times before

it reached her particular unit of the FBI lab. Significantly, Agent Lundy testified that once the evidence reached the FBI from North Carolina, part of that "normal procedure" was for the evidence to be brought to the FBI control unit, after which it would be given to a particular lab unit where someone from that unit would then transfer the evidence over to a particular unit examiner. She further testified that there was nothing about the package she received in this case which gave her cause to believe that the evidence contained in it had been tampered with or otherwise altered. Considering this testimony, and the fact that any "weak link" in the State's chain of custody goes to the weight of the evidence and not its admissibility, we believe the State established an adequate chain of custody for admitting into evidence the challenged exhibits.

### Conclusion

For all the reasons discussed herein, we hold that Marvin Augusta Owen received a fair trial, free from prejudicial error.

No error.

Judges JOHN and McGEE concur.