IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA20-45

Filed: 1 December 2020

Wake County No. 17 CRS 213180; 19 CRS 000071

STATE OF NORTH CAROLINA

v.

DERICK CLEMONS, Defendant.

Appeal by Defendant from judgment entered 28 August 2019 by Judge Paul C. Ridgeway in Wake County Superior Court. Heard in the Court of Appeals 12 May 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Bethany A. Burgon, for the State.*

*Benjamin J. Kull for defendant-appellant.*

MURPHY, Judge.

Before screenshots of an online written statement on social media can be admitted into evidence they must be authenticated as both a photograph and a written statement. To authenticate evidence in this manner, there must be circumstantial or direct evidence sufficient to conclude a screenshot accurately represents the content on the website it is claimed to come from and to conclude the written statement was made by who is claimed to have written it. Here, screenshots of comments on Facebook posts, made by an account not in Defendant's name, were

properly authenticated because there was sufficient circumstantial evidence to show the screenshots of the Facebook comments in fact depicted the Facebook posts and comments and to show the Facebook comments were made by Defendant. We hold there was no error.

## BACKGROUND

On 9 June 2017, Inez DeJesus renewed her domestic violence protective order ("DVPO") prohibiting contact of any kind by Defendant, Derick Clemons, in anticipation of his release from prison. Later in June 2017, Defendant was released from prison and picked up by his and DeJesus's daughter. Shortly after, on 5 July 2017, DeJesus started receiving phone calls from a restricted number, which later were determined to all come from the same number. She received these calls every day and often multiple times in a single day from 5 July 2017 to 11 July 2017, sometimes also receiving voicemails left in Defendant's voice and referring to events she and Defendant had engaged in together. During this time period, there were comments made on DeJesus's Facebook posts, from her daughter's account, that DeJesus didn't think her daughter would have posted ("Facebook comments").

On 11 July 2017, DeJesus reported these events to police and showed police officers the Facebook comments and the phone calls from a restricted number, and played the voicemails left by the number. Based on these communications, police officers obtained a warrant for Defendant's arrest for violation of the DVPO, and he

was subsequently arrested. Following his arrest, DeJesus did not receive any more calls from restricted numbers, or Facebook comments from her daughter's account seeming to come from someone else.

Pre-trial, Defendant filed a motion in limine seeking to exclude testimony regarding the Facebook comments based on a lack of connection between Defendant and his daughter's Facebook account. The trial court denied this motion based on the State's assertion DeJesus would testify the posts came from Defendant, not their daughter.[1] At trial, the Facebook comments were admitted and considered authenticated based on the testimony of DeJesus. Prior to the admission of the screenshots of the Facebook comments, DeJesus testified as follows:

> [THE STATE:] Any idea who met him when he was released?
>
> [DEJESUS:] Yes, I do know who.
>
> [THE STATE:] Who is that?
>
> [DEJESUS:] Our daughter, Ashley Clemons.
>
> [THE STATE:] What is your relationship like with Ashley?
>
> [DEJESUS:] As of right now, it's getting better.
>
> [THE STATE:] How has it been prior to now?
>
> [DEJESUS:] It was very rocky.

---

[1] In part, the State contended police reports would show Defendant made these comments, not the daughter, however these reports were not introduced into evidence and are not a part of the Record.

[THE STATE:] Why was it a rocky relationship with Ashley?

[DEJESUS:] Because, you know, she was our first daughter, his first daughter. So she has a real good connection with her dad.

[THE STATE:] After you became aware that [D]efendant was released, did you have any -- in those initial days, did you receive any sort of strange contact?

[DEJESUS:] Not right -- right before he got out – not during -- he got -- not -- I have, but not as soon as he got out.

[THE STATE:] Okay. About how long after he got out did you start receiving the contact?

[DEJESUS:] Maybe a week or two.

[THE STATE:] Okay. And did you receive phone calls on your cell phone from a private or blocked number?

[DEJESUS:] Yes, I have.

[THE STATE:] When did you start receiving those calls?

[DEJESUS:] It was July 5th.

[THE STATE:] Of what year?

[DEJESUS:] Of 2018 -- 2017.

[THE STATE:] The phone number that you had back in 2017, how long had you had that phone number?

[DEJESUS:] Since 2011.

[THE STATE:] So in 2011, you changed your cell phone number?

[DEJESUS:] I did.

. . .

[THE STATE:] Prior to July 5th of 2017, had you been receiving calls on your cell phone from either a blocked or private number?

[DEJESUS:] No, I haven't.

[THE STATE:] How many calls, Inez, would you estimate you received from a private or blocked number starting on July 5th and continuing thereafter?

[DEJESUS:] I don't know -- I can't remember how many, but it was -- it was plenty enough for me to call.

[THE STATE:] Did you answer any of those calls?

[DEJESUS:] I did not. If I don't know the person, I won't. If it was important, they will leave a message.

[THE STATE:] When you initially started getting those unknown or private calls on your cell phone, were voice messages left?

[DEJESUS:] There was.

[THE STATE:] Okay. Did that occur right away or did that occur some time later?

[DEJESUS:] Maybe like two days after.

[THE STATE:] Okay. About how long were you receiving those calls and voice messages from the blocked or private number?

[DEJESUS:] Up until July 11th.

[THE STATE:] So from July 15th -- I'm sorry, July 5 to July 11, 2017?

[DEJESUS:] Correct.

[THE STATE:] Do you recall what, if anything, was left on any of those voice messages?

[DEJESUS:] To stand out, we went on vacation to Miami and we went to Bahamas on a cruise ship.

[THE STATE:] And when you say "we went," who is "we"?

[DEJESUS:] Me and him and two females.

[THE STATE:] Okay. And when did you go on that vacation to Miami and the Bahamas?

[DEJESUS:] I don't know the exact year, but it was maybe like April sometime.

[THE STATE:] Okay. That was before 2011?

[DEJESUS:] Right. It was sometime in 2000s, when we were in a marriage together.

[THE STATE:] Okay. Is it fair to say it was a long time before 2017?

[DEJESUS:] Yes.

[THE STATE:] When you say that one of those messages said "Miami, Bahamas," was that the extent of the message?

[DEJESUS:] That's all that was said.

[THE STATE:] Did you recognize the voice –

[DEJESUS:] I did.

[THE STATE:] -- in that voice mail?

[DEJESUS:] I did.

[THE STATE:] And whose voice was that?

[DEJESUS:] Mr. Clemons.

[THE STATE:] That's the defendant in this case?

[DEJESUS:] Yes.

[THE STATE:] Why is that particular event, the Miami, Bahamas, of significance to you?

[DEJESUS:] Because he is the only guy that I went on a trip with.

[THE STATE:] Was this something that would have been common knowledge to people?

[DEJESUS:] No, not -- if I told them.

[THE STATE:] Do you recall any of the other voice messages that were left?

[DEJESUS:] There was one I really -- I forgot what it said, but it was something like –

[DEFENDANT:] Oh, Your Honor, I'm sorry. We would move to strike the evidence as far as the phone calls based on the arguments that we previously made. We'd move to strike -- object to the questions and move to strike the testimony based on arguments we previously made to the Court.

THE COURT: Right. That objection is overruled. You may answer the question.

- 7 -

[THE STATE:] To go back, Inez, do you recall any other voice messages that were left for you from an either blocked or private number?

[DEJESUS:] Yes.

[THE STATE:] Okay. And do you recall the voice on that voice message?

[DEJESUS:] Yes.

[THE STATE:] Whose voice was that?

[DEJESUS:] Mr. Clemons.

[THE STATE:] Okay. And do you recall the content of that voice message?

[DEJESUS:] Yes.

[THE STATE:] What was contained in that voice message?

[DEJESUS:] It was something like he's going to come get me or get something -- I don't really clearly remember.

[THE STATE:] Did you perceive it as threatening?

[DEJESUS:] Yes.

[THE STATE:] Did you receive any other voice messages that you can recall?

[DEJESUS:] I did, but it wasn't like -- it was no voice after. It was just like him just being on the phone breathing.

[THE STATE:] You could hear breathing on the phone?

[DEJESUS:] Yes.

[THE STATE:] What times of day were these calls and voice messages coming in to you?

[DEJESUS:] I can recall one was like in the morning, one was in the afternoon and one was in the evening time.

[THE STATE:] So all throughout the day?

[DEJESUS:] Yeah.

[THE STATE:] During this same time period, did you start to receive -- do you have a Facebook page?

[DEJESUS:] I do have a Facebook.

[THE STATE:] And is that page something that has your name on it that identifies you?

[DEJESUS:] Yes.

[THE STATE:] Did you also start to receive comments left on posts that you made on Facebook?

[DEJESUS:] I did.

MS. FETTER: Your Honor, may I approach?

THE COURT: Yes.

(State's Exhibits 4 - 6 marked for identification.)

[THE STATE:] Inez, I'm showing you what's been previously marked for identification purposes as State's Exhibit 4, 5 and 6. Will you take a look at those please and let me know if you recognize them.

[DEJESUS:] Yep. Yes, I do.

[THE STATE:] What are State's Exhibit 4, 5 and 6?

- 9 -

[DEJESUS:] They're my posts on -- Facebook posts.

[THE STATE:] And what about State's Exhibit 4, 5 and 6 – did you take screenshots?

[DEJESUS:] I did.

[THE STATE:] Okay. Is that what these are?

[DEJESUS:] Yes.

[THE STATE:] And why did you specifically screenshot State's Exhibits 4, 5 and 6 from your Facebook page?

[DEFENDANT:] Your Honor, again, we would object to the questions and move to strike the testimony based on arguments previously made in court.

THE COURT: The objection's overruled.

[DEJESUS:] Because I know my daughter wouldn't write none of this stuff on my page. She never posts on my Facebook.

[THE STATE:] And we'll talk about that in one second, Inez. These are messages that –

[DEJESUS:] Yes.

[THE STATE:] -- you received on Facebook?

[DEJESUS:] Yes.

[THE STATE:] Your Honor, at this time the State moves Exhibits 4, 5 and 6 into evidence.

[DEFENDANT:] Objection on the grounds previously stated.

> THE COURT: The objection is overruled. Four, Five and Six are admitted.
>
> (State's Exhibits 4 - 6 admitted into evidence.)

On appeal, Defendant contends the admission of the testimony and exhibits related to the Facebook comments was improper because the Facebook comments were not properly authenticated as being made by Defendant. Additionally, on appeal the parties dispute whether abuse of discretion or de novo review is appropriate for authentication issues.

## ANALYSIS

### A. Standard of Review

Defendant contends we review de novo a decision regarding authentication; whereas, the State contends we review for an abuse of discretion. "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-633, 669 S.E.2d 290, 294 (2008) (citations and internal marks omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). We hold the appropriate standard of review for authentication of evidence is de novo.[2]

---

[2] While not making any determination as to the prejudicial effect of such an abuse of discretion, we note if we were to accept the State's standard of review argument, we would find the trial court's

At first glance, "[t]he cases from the Court of Appeals are in conflict regarding whether an abuse of discretion or de novo standard of review is appropriate in the context of authentication of documentary evidence." *In re Lucks*, 369 N.C. 222, 231, 794 S.E.2d 501, 508 (2016) (Hudson, J., concurring). However, upon a closer look, it appears our rule is to review trial court decisions regarding authentication de novo. The two cases cited by the State here and Justice Hudson in *In re Lucks* to support the idea that abuse of discretion review has been conducted on authentication issues are not convincing. *See In re Lucks*, 369 N.C. at 231, 794 S.E.2d at 508 (Hudson, J., concurring) (citing *In re Foreclosure by Goddard & Peterson, PLLC*, 248 N.C. App. 190, 200, 789 S.E.2d 835, 842 (2016); *Brown v. City of Winston-Salem*, 176 N.C. App. 497, 505, 626 S.E.2d 747, 753 (2006)).

In the first case, *In re Foreclosure by Goddard & Peterson, PLLC*, we treated the issue of authentication as abandoned due to the appellant's failure to cite legal authority to support the claim as required by N.C. R. App. P. 28(b)(6). *In re Foreclosure by Goddard & Peterson, PLLC*, 248 N.C. App. at 200, 789 S.E.2d at 843. This case does not establish or discuss a standard of review for a trial court's determination regarding the authentication of evidence.

---

decision to be an abuse of discretion based on its misapprehension of law when it said, "I think that it goes to the weight rather than the admissibility. It is a question for the jury to decide who authored those posts." On the contrary, there must be sufficient evidence to conclude Defendant authored the posts before the jury could review the evidence. *See State v. Nunez,* 204 N.C. App. 164, 170, 693 S.E.2d 223, 227 (2010) ("When a trial [court] acts under a misapprehension of the law, this constitutes an abuse of discretion.").

In the second case, *Brown v. City of Winston-Salem*, we reviewed whether spreadsheets intended to be introduced into evidence were properly authenticated. *Brown*, 176 N.C. App. at 505, 626 S.E.2d at 753. In *Brown*, we determined the spreadsheets were not properly authenticated and held "the trial court's ruling that petitioners' spreadsheets could be admitted only for the limited purpose [the parties had stipulated to] was proper, and did not constitute an abuse of discretion." *Id.* at 506, 626 S.E.2d at 753. Although we determined the evidence was not properly authenticated, we did not address the authentication determination; instead, we concluded an abuse of discretion did not occur in the decision to admit the evidence for the limited purpose stipulated to by the parties. At no point did we set out a standard of review for authentication specifically. We simply stated "[o]n appeal, the standard of review of a trial court's decision to exclude or admit evidence is that of an abuse of discretion." *Brown*, 176 N.C. App. at 505, 626 S.E.2d at 753 (2006) (citing *Williams v. Bell*, 167 N.C. App. 674, 678, 606 S.E.2d 436, 439 (2005)). Additionally, *Williams* only referred to decisions to exclude evidence and ultimately concluded the excluded evidence there was irrelevant under Rule 401. *Williams*, 167 N.C. App. at 678, 606 S.E.2d at 439. At no point does *Williams* discuss authentication. *Id.*

Conversely, the cases in which we review authentication explicitly state de novo is the appropriate standard of review. We have repeatedly stated "[a] trial court's determination as to whether a document has been sufficiently authenticated

is reviewed *de novo* on appeal as a question of law." *See State v. DeJesus*, 265 N.C. App. 279, 288, 827 S.E.2d 744, 751, *disc. review denied*, 372 N.C. 707, 830 S.E.2d 837 (2019); *State v. Allen*, 258 N.C. App. 285, 288, 812 S.E.2d 192, 195, *disc. review denied*, 371 N.C. 449, 817 S.E.2d 202 (2018); *State v. Ford*, 245 N.C. App. 510, 517, 782 S.E.2d 98, 104 (2016); *State v. Hicks*, 243 N.C. App. 628, 638, 777 S.E.2d 341, 348 (2015); *State v. Watlington*, 234 N.C. App. 580, 590, 759 S.E.2d 116, 124 (2014) (applying this standard of review to text messages); *State v. Crawley*, 217 N.C. App. 509, 515, 719 S.E.2d 632, 637 (2011). *Crawley* was the first case to state this rule in these terms and its holding can be traced back to *State v. LeDuc*.

In *LeDuc*, our Supreme Court addressed the requirements of authentication in the context of comparing handwritings, stating:

> Before handwritings can be submitted to the jury for its comparison, however, the trial [court] must satisfy [itself] that one of the handwritings is genuine. The statute so provides. We hold, in addition, that the trial [court] must also be satisfied that there is enough similarity between the genuine handwriting and the disputed handwriting, that the jury could reasonably infer that the disputed handwriting is also genuine. *Both of these preliminary determinations by the trial [court] are questions of law fully reviewable on appeal.*

*State v. LeDuc*, 306 N.C. 62, 73-74, 291 S.E.2d 607, 614 (1982) (emphasis added), *overruled in part on other grounds by State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987); *see also State v. McCoy*, 234 N.C. App. 268, 269-71, 759 S.E.2d 330, 332-33 (2014); *State v. Owen*, 130 N.C. App. 505, 509-10, 503 S.E.2d 426, 429-30 (1998). This

reasoning is equally applicable to authentication situations outside of handwriting. *See, e.g., Watlington*, 234 N.C. App. at 591, 759 S.E.2d at 124 (discussing de novo review when the authentication of text messages was at issue).

Furthermore, in *State v. Snead*, our Supreme Court, without explicitly stating it, conducted de novo review of whether the authentication of a video was appropriate.[3] *State v. Snead*, 368 N.C. 811, 815-16, 783 S.E.2d 733, 737 (2016). In reversing our decision as to authentication, our Supreme Court stated:

> Given that [the] defendant freely admitted that he is one of the two people seen in the video stealing shirts and that he in fact stole the shirts, he offered the trial court no reason to doubt the reliability or accuracy of the footage contained in the video. Regardless, [the witness's] testimony was sufficient to authenticate the video under Rule 901. [The witness] established that the recording process was reliable by testifying that he was familiar with how Belk's video surveillance system worked, that the recording equipment was "industry standard," that the equipment was "in working order" on 1 February 2013, and that the videos produced by the surveillance system contain safeguards to prevent tampering. Moreover, [the witness] established that the video introduced at trial was the same video produced by the recording process by stating that the State's exhibit at trial contained exactly the same video that he saw on the digital video recorder. Because defendant made no argument that the video had been altered, the State was not required to offer further evidence of chain of custody. [The witness's] testimony, therefore,

---

[3] We also note in *State v. Snead*, we held "[a] trial court's determination as to whether a videotape has been properly authenticated is reviewed *de novo* on appeal." *State v. Snead*, 239 N.C. App. 439, 443, 768 S.E.2d 344, 347 (2015), *rev'd in part on other grounds,* 368 N.C. 811, 783 S.E.2d 733 (2016) (citing *Crawley*, 217 N.C. App. at 515, 719 S.E.2d at 637).

satisfied Rule 901, and the trial court did not err in admitting the video into evidence.

*Id.* Although not explicitly stated, our Supreme Court analyzed this issue de novo as it "considered the matter anew" and at no point did our Supreme Court reference language related to the abuse of discretion standard in determining this issue.

Based on *Snead*, *LeDuc*, and our extensive caselaw explicitly applying de novo review on issues of authentication, we conduct de novo review of whether the evidence at issue here was properly authenticated.

## B. Authentication

Defendant contends the screenshots of the Facebook comments were written statements that must have been authenticated as statements; whereas, the State contends these screenshots were photographs that only needed to be authenticated as photographs. We hold these Facebook comments must have been authenticated as both photographs and written statements.

Rule of Evidence 901(a) reads "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C.G.S. § 8C-1, Rule 901(a) (2019). The State used the screenshots of the Facebook comments to show Defendant violated the DVPO by communicating with DeJesus. In order for the screenshots of the Facebook comments to support finding Defendant contacted DeJesus, the screenshots must have accurately reflected

DeJesus's Facebook page. N.C.G.S. § 8C-1, Rule 901(a) (2019). Therefore, the screenshots must have been authenticated as photographs. However, the screenshots of the Facebook comments are also statements—the State wanted the jury to use the screenshots to conclude Defendant communicated with DeJesus in violation of the DVPO through the Facebook comments. These are not being introduced simply to show DeJesus's Facebook posts had comments from her daughter's account because this would not show any communication by Defendant in violation of the DVPO. The evidence must show Defendant was responsible for the Facebook comments in order to show he communicated with DeJesus in violation of the DVPO. In light of this purpose, the Facebook comments also needed to be authenticated by evidence sufficient to support finding they were communications actually made by Defendant. N.C.G.S. § 8C-1, Rule 901(a) (2019).

"In order for a photograph to be introduced, it must first be properly authenticated by a witness with knowledge that the evidence is in fact what it purports to be." *State v. Lee*, 335 N.C. 244, 270, 439 S.E.2d 547, 560 (1994). Here, the screenshots were properly authenticated as required for photographs. On direct examination of DeJesus, the following exchange occurred:

> [THE STATE:] During this same time period, did you start
> to receive -- do you have a Facebook page?
>
> [DEJESUS:] I do have a Facebook.

[THE STATE:] And is that page something that has your name on it that identifies you?

[DEJESUS:] Yes.

[THE STATE:] Did you also start to receive comments left on posts that you made on Facebook?

[DEJESUS:] I did.

[THE STATE:] Your Honor, may I approach?

THE COURT: Yes.

(State's Exhibits 4 - 6 marked for identification.)

[THE STATE:] Inez, I'm showing you what's been previously marked for identification purposes as State's Exhibit 4, 5 and 6. Will you take a look at those please and let me know if you recognize them.

[DEJESUS:] Yep. Yes, I do.

[THE STATE:] What are State's Exhibit 4, 5 and 6?

[DEJESUS:] They're my posts on -- Facebook posts.

[THE STATE:] And what about State's Exhibit 4, 5 and 6 – did you take screenshots?

[DEJESUS:] I did.

[THE STATE:] Okay. Is that what these are?

[DEJESUS:] Yes.

[THE STATE:] And why did you specifically screenshot State's Exhibits 4, 5 and 6 from your Facebook page?

[DEFENDANT:] Your Honor, again, we would object to the questions and move to strike the testimony based on arguments previously made in court.

THE COURT: The objection's overruled.

[DEJESUS:] Because I know my daughter wouldn't write none of this stuff on my page. She never posts on my Facebook.

[THE STATE:] And we'll talk about that in one second, Inez. These are messages that –

[DEJESUS:] Yes.

[THE STATE:] -- you received on Facebook?

[DEJESUS:] Yes.

[THE STATE:] Your Honor, at this time the State moves Exhibits 4, 5 and 6 into evidence.

[DEFENDANT:] Objection on the grounds previously stated.

THE COURT: The objection is overruled. Four, Five and Six are admitted.

As Defendant concedes, the above inquiry was sufficient to authenticate the screenshots of the Facebook comments as photographs. DeJesus testified she took the screenshots of the comments on her Facebook posts, which showed the screenshots were in fact what they purported to be. Since the screenshots of the Facebook comments were properly authenticated as photographs, we next determine if they were properly authenticated as written statements.

"Pursuant to Rule 901 of the North Carolina Rules of Evidence, every writing sought to be admitted must first be properly authenticated." *Allen*, 258 N.C. App. at 288, 812 S.E.2d at 195 (quoting *State v. Ferguson*, 145 N.C. App. 302, 312, 549 S.E.2d 889, 896 (2001)). Our Supreme Court has stated "[i]t was not error for the trial court to admit the [evidence] if it could reasonably determine that there was sufficient evidence to support a finding that 'the matter in question is what its proponent claims.'" *State v. Wiggins*, 334 N.C. 18, 34, 431 S.E.2d 755, 764 (1993) (quoting N.C.G.S. § 8C-1, Rule 901). According to Rule 901(b)(4), Rule 901(a) can be satisfied by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." N.C.G.S. § 8C-1, Rule 901(b)(4) (2019). Furthermore, we have acknowledged "the authorship and genuineness of letters, typewritten or other, may be proved by circumstantial evidence[.]" *State v. Young*, 186 N.C. App. 343, 354, 651 S.E.2d 576, 583 (2007) (quoting *State v. Davis*, 203 N.C. 13, 28, 164 S.E. 737, 745, *cert. denied*, 287 U.S. 649, 77 L. Ed. 561 (1932)).

Applying Rule 901(b)(4) here, the Facebook comments were properly authenticated prior to admission as the distinctive characteristics of the post in conjunction with the circumstances are sufficient to conclude Defendant wrote the comments. As stated above, this evidence was introduced to show Defendant made a written statement to DeJesus in violation of the DVPO. Before State's Exhibits 4, 5,

and 6 were admitted, circumstantial evidence was presented that was sufficient to conclude Defendant had access to his daughter's Facebook account allowing him to make the Facebook comments. This circumstantial evidence includes: Defendant and DeJesus's daughter picked up Defendant from jail upon his release; their daughter has a strong relationship with Defendant and a "very rocky" one with DeJesus; DeJesus began to receive the Facebook comments a week or two after Defendant was released; and DeJesus took the screenshots of the Facebook comments because "[she knew her] daughter wouldn't write none of this stuff on [her Facebook] page. [Her daughter] never posts on [her] Facebook." The Facebook comments made from the daughter's account, which were unlike her, in conjunction with Defendant's recent interaction and close relationship with his daughter is circumstantial evidence sufficient to conclude Defendant had access to her Facebook account.

In conjunction with Defendant's potential access to his daughter's Facebook account, there was sufficient circumstantial evidence to conclude the person who posted these comments from the daughter's Facebook account was Defendant. This circumstantial evidence includes: Defendant had ignored a DVPO before by calling DeJesus and sending her letters from jail in 2013 and 2015[4]; a week or two after

---

[4] This evidence was limited at trial in the following instruction: "Evidence has been received tending to show that despite an existing domestic violence protective order, [D]efendant attempted to make telephone contact and communicate by letter with Ms. DeJesus in 2013 and 2015. This evidence was received solely for the purpose of showing: The identity of the person who committed the crime charged in this case, if it was committed; That [D]efendant had a motive for the commission of the

Defendant's release, on 5 July 2017 until 11 July 2017, DeJesus received phone calls and voicemails from a blocked number to the same phone number DeJesus had used since 2011; these voicemails had Defendant's voice and one referred to an event that took place with Defendant and DeJesus, one was just breathing, and one was threatening; DeJesus had a Facebook page in her name and in the same week-long period she also started to receive comments on her posts, which were shown in State's Exhibits 4, 5, and 6; and these were screenshots she took of her posts because "[she knew her] daughter wouldn't write none of this stuff on [her] page. [Her daughter] never posts on [her] Facebook." The above circumstantial evidence, in conjunction with the circumstantial evidence of Defendant's access to the daughter's Facebook account, was sufficient to find Defendant posted the Facebook comments because Defendant had access to the Facebook account to make the comments, and the Facebook comments were not made by the daughter but were made in the same timeframe as the phone calls Defendant made to DeJesus.

According to *Young*, the circumstantial evidence here is appropriate to authenticate the Facebook comments as there was circumstantial evidence that was sufficient to find the Facebook comments were written by Defendant. Additionally,

---

crime charged in this case; That [D]efendant had knowledge, which is a necessary element of the crime charged in this case; The absence of a mistake. If you believe this evidence, you may consider it, but only for the limited purpose for which it was received. You may not consider it for any other purpose." Our use of the prior violation of a DVPO here is permissible since it is used to show knowledge of the phone number.

> [o]nce evidence from which the jury could find that the writing is genuine has been introduced, the writing becomes admissible. Upon the admission of the writing into evidence, it is solely for the jury to determine the credibility of the evidence both with regard to the authenticity of the writing and the credibility of the writing itself.

*Young*, 186 N.C. App. at 354, 651 S.E.2d at 583 (quoting *Milner Hotels, Inc. v. Mecklenburg Hotel, Inc.,* 42 N.C. App. 179, 180-81, 256 S.E.2d 310, 311 (1979)). The evidence was sufficient to support the trial court's authentication and admission of the Facebook comments, and upon admission it was for the jury to decide the authenticity and credibility of the writing. *Id.*

## CONCLUSION

The trial court reasonably determined there was sufficient evidence to conclude the Facebook comments were made by Defendant. It was proper for the jury to determine whether the evidence supported a violation of the DVPO.

NO ERROR.

Judges BRYANT and BERGER concur in result only.